PUBLISHED

# UNITED STATES COURT OF APPEALS
## FOR THE FOURTH CIRCUIT

UNITED STATES OF AMERICA,
  *Plaintiff-Appellee,*

v.

ERIC KEVIN MASHBURN,
  *Defendant-Appellant.*

No. 03-4932

Appeal from the United States District Court
for the Middle District of North Carolina, at Greensboro.
William L. Osteen, District Judge.
(CR-03-231)

Argued: February 4, 2005

Decided: April 25, 2005

Before WILKINS, Chief Judge, and KING
and DUNCAN, Circuit Judges.

_____

Affirmed by published opinion. Chief Judge Wilkins wrote the opinion, in which Judge King and Judge Duncan joined.

_____

## COUNSEL

**ARGUED:** James B. Craven, III, Durham, North Carolina, for Appellant. Kearns Davis, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Greensboro, North Carolina, for Appellee. **ON BRIEF:** Anna Mills Wagoner, United States Attorney, Greensboro, North Carolina, for Appellee.

**OPINION**

WILKINS, Chief Judge:

Eric Kevin Mashburn appeals a decision of the district court deny-ing his motion to suppress statements he made to police following his arrest for conspiracy to distribute, distribution of, and possession with the intent to distribute methamphetamine, *see* 21 U.S.C.A. §§ 841(a)(1), 846 (West 1999), as well as for possession of a firearm in connection with a drug trafficking offense, *see* 18 U.S.C.A. § 924(c)(1)(A) (West 2000). Mashburn argues that consideration of his statements by the district court at sentencing violated the Fifth Amendment. Finding no Fifth Amendment violation, we affirm.

I.

Federal agents, acting on information obtained through a controlled narcotics purchase, arrested Mashburn outside his home in Chatham County, North Carolina. When arrested, Mashburn was in possession of methamphetamine and a firearm. One of the agents placed Mash-burn in handcuffs and held him outside his home for 10 to 15 minutes while several other agents executed a search warrant inside. Mash-burn, still in handcuffs, was then brought into his home and seated on the couch in his living room.

One of the agents told Mashburn that he was facing 10 years in prison for the drug and firearm offenses and that "the only way that [he could] actually help [himself] in a federal system is, number one, by acceptance of responsibility, and number two is substantial assis-tance." J.A. 48. Mashburn then began to respond to the agents' ques-tions. After "approximately two to three" questions, *id.* at 50, the agents realized that Mashburn had not yet been given the required *Miranda* warnings, *see Miranda v. Arizona*, 384 U.S. 436, 479 (1966).[1]

---

[1]The warnings required by *Miranda* are that a suspect

has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires.

*Miranda*, 384 U.S. at 479.

The agents immediately ceased questioning, and one of the agents retrieved a waiver-of-rights form from a patrol car. The agents informed Mashburn of his *Miranda* rights, Mashburn signed the waiver form, and the questioning resumed. To cover the material discussed before the *Miranda* warnings were given, the agents asked leading questions to which Mashburn responded "yes" or "no." In his postwarning statements, Mashburn detailed the extent of his involvement with drug trafficking, including the amounts and sources of his purchases.[2]

Mashburn pleaded guilty to possession with the intent to distribute and distribution of methamphetamine, as well as to possession of a firearm in connection with a drug trafficking offense. He moved to suppress consideration at sentencing of his statements made before and after he was warned of and waived his *Miranda* rights. After a hearing, the district court denied the motion to suppress and considered the substance of the postwarning statements at sentencing. Mashburn was sentenced to 168 months' imprisonment.[3]

## II.

The Self-Incrimination Clause of the Fifth Amendment ensures that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const. amend. V. With "the advent of modern custodial police interrogation" there arose "an increased concern about confessions obtained by coercion" in violation of the guarantee against compelled self-incrimination. *Dickerson v. United States*, 530 U.S. 428, 434-35 (2000). Recognizing that the pressure and isolation inherent in custodial interrogation could overcome the

---

[2]The record is unclear as to what exactly Mashburn said before he received his *Miranda* warnings. Mashburn's motion to suppress indicates that, before receiving *Miranda* warnings, he talked about the quantities of drugs in which he had been dealing. Special Agent Jeff Brown testified at the suppression hearing that Mashburn "pretty well told us what we wanted to know" before he was given his *Miranda* warnings. J.A. 49. It is clear from the record, however, that the postwarning statements left none of the prewarning statements uncovered.

[3]Mashburn does not argue that his sentence was imposed in violation of *United States v. Booker*, 125 S. Ct. 738 (2005).

resilience of a suspect otherwise not inclined to incriminate himself, the Supreme Court in *Miranda* "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 124 S. Ct. 2601, 2608 (2004) (plurality opinion). Statements obtained in violation of *Miranda* are admissible only in narrow circumstances. *See Oregon v. Elstad*, 470 U.S. 298, 307 (1985) (holding that statements obtained in violation of *Miranda* are irrebuttably presumed involuntary "for purposes of the prosecution's case in chief"); *New York v. Quarles*, 467 U.S. 649, 655-57 (1984) (establishing a narrow public-safety exception to *Miranda*); *Harris v. New York*, 401 U.S. 222, 226 (1971) (holding that voluntary statements obtained in violation of *Miranda* are admissible on cross-examination for purposes of impeachment).

Because Mashburn's initial statements preceded the administration and his voluntary waiver of *Miranda* rights, the parties agree that his initial statements are irrebuttably presumed involuntary. *See Elstad*, 470 U.S. at 307. The issue presented here is whether those initial, unwarned statements rendered involuntary the statements Mashburn made *after* receiving and waiving *Miranda* rights. In reviewing the denial of Mashburn's motion to suppress, we must accept the factual findings of the district court unless clearly erroneous, but we review de novo the conclusion of the district court that Mashburn's postwarning statements were voluntary. *See United States v. Braxton*, 112 F.3d 777, 781 (4th Cir. 1997) (en banc).

A.

In *Elstad*, the Supreme Court held that "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Elstad*, 470 U.S. at 314. There, police officers questioned Michael Elstad about an alleged burglary without first administering *Miranda* warnings. *See id.* at 301. Seated in his living room, Elstad admitted to the officers that he was present when the burglary occurred. *See id.* The officers then took Elstad to police headquarters and, approximately one hour later, advised him of his *Miranda* rights. *See id.* After knowingly

and voluntarily waiving those rights, Elstad gave a full confession. *See id.* At trial, Elstad moved to suppress his confession, arguing that his prior unwarned statement "let the cat out of the bag" and "tainted the subsequent confession as fruit of the poisonous tree." *Id.* at 302 (internal quotation marks omitted). The trial court admitted the confession, but the Oregon Court of Appeals reversed. *See id.* at 302-03. "Regardless of the absence of actual compulsion," the court of appeals explained, "the coercive impact of the unconstitutionally obtained statement remains, because in a defendant's mind it has sealed his fate." *Id.* at 303 (internal quotation marks omitted).

After the Oregon Supreme Court denied further review, the United States Supreme Court granted certiorari and reversed. *See id.* at 303, 318. The Court first rejected application of the "fruit of the poisonous tree" doctrine—familiar from the Fourth Amendment context, *see Taylor v. Alabama*, 457 U.S. 687, 694 (1982); *Wong Sun v. United States*, 371 U.S. 471, 484-86 (1963)—to voluntary, warned statements that come on the heels of unwarned but otherwise voluntary statements. *See Elstad*, 470 U.S. at 304-09. Noting the "fundamental differences between the role of the Fourth Amendment exclusionary rule and the function of *Miranda* in guarding against the prosecutorial use of compelled statements as prohibited by the Fifth Amendment," *id.* at 304, the Court deemed it

> an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period,

*id.* at 309. Therefore, the Court ruled that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent [warned] statement should turn . . . solely on whether it is knowingly and voluntarily made." *Id.*

The Court then rejected the "cat out of the bag" theory embraced by the state court. *See id.* at 309-14. The Court first noted that even in extreme cases "in which police forced a full confession from the

accused through unconscionable methods of interrogation, the Court has assumed that the coercive effect of the confession could, with time, be dissipated." *Id.* at 311-12. The Court explained that "the causal connection between any psychological disadvantage created by [an earlier] admission and [the] ultimate decision to cooperate is speculative and attenuated at best." *Id.* at 313-14. Therefore, the Court ruled that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" as to any subsequent, warned statement. *Id.* at 314.

B.

Last Term, in *Seibert*, the Court addressed the admissibility of statements obtained through a two-step police protocol: first, intentionally withholding *Miranda* warnings from a suspect, questioning the suspect until securing a confession; then obtaining a waiver of *Miranda* rights from the suspect and covering the same material using leading questions. *See Seibert*, 124 S. Ct. at 2605-06, 2608-09 (plurality opinion). This tactic, termed "question-first," was designed "to render *Miranda* warnings ineffective by waiting for a particularly opportune time to give them, after the suspect has already confessed." *Id.* at 2610. Deeming it "absurd to think that mere recitation of the litany suffices to satisfy *Miranda* in every conceivable circumstance," a four-Justice plurality considered it "likely that if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content." *Id.*

The plurality distinguished *Elstad*, characterizing "the living room conversation" at issue there "as a good-faith *Miranda* mistake, not only open to correction by careful warnings before systematic questioning . . ., but posing no threat to warn-first practice generally." *Id.* at 2612. In the plurality's view, the admissibility of warned statements that follow on the heels of unwarned statements should depend "on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object," taking into account

> the completeness and detail of the questions and answers in
> the first round of interrogation, the overlapping content of

the two statements, the timing and setting of the first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.* Applying these factors to the question-first protocol, the plurality concluded that the *Miranda* warnings delivered midstream would not have adequately conveyed to the suspect "that she retained a choice about continuing to talk," and the statements obtained thereby were inadmissible. *Id.* at 2613.

Justice Kennedy, concurring in the judgment, added the fifth vote for suppression. In his view, the plurality's multi-factor test, which would apply to both intentional and unintentional two-stage interrogations, "cut[ ] too broadly." *Id.* at 2616 (Kennedy, J., concurring in the judgment). Instead, he believed that "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Id.* If so, he explained, "postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.*[4] Because no curative steps had been taken in *Seibert*, he deemed the postwarning statements inadmissible. *See id.*

## C.

Because none of the opinions in *Seibert* garnered the votes of five Justices, the parties invite us to examine the individual opinions in both *Elstad* and *Seibert* (as well as which Justices joined each opinion) to predict how the Court would resolve the issue before us. We are mindful, however, that our duty "is not to predict what the

---

[4]In Justice Kennedy's view, such curative measures "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver"—for example, "a substantial break in time and circumstances" between the two statements, or "an additional warning that explains the likely inadmissibility of the prewarning custodial statement." *Seibert*, 124 S. Ct. at 2616 (Kennedy, J., concurring in the judgment).

Supreme Court might do but rather to follow what it has done." *West v. Anne Arundel County*, 137 F.3d 752, 757 (4th Cir. 1998). "When a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds." *Marks v. United States*, 430 U.S. 188, 193 (1977) (internal quotation marks omitted).

In *Seibert*, Justice Kennedy concurred in the judgment of the Court on the narrowest grounds. Unlike the plurality opinion which announced a multi-factor test that would apply to both intentional and unintentional two-stage interrogations, *see Seibert*, 124 S. Ct. at 2612 (plurality opinion), Justice Kennedy's concurring opinion set forth "a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning," *id.* at 2616 (Kennedy, J., concurring in the judgment). Justice Kennedy's opinion therefore represents the holding of the *Seibert* Court: The admissibility of postwarning statements is governed by *Elstad* unless the deliberate "question-first" strategy is employed.[5] *See id.* If that strategy is deliberately employed, postwarning statements related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statements are made. *See id.*; *accord United States v. Stewart*, 388 F.3d 1079, 1086, 1090 (7th Cir. 2004) (holding that, under *Marks*, Justice Kennedy's opinion provided the applicable rule); *Reinert v. Larkins*, 379 F.3d 76, 91 (3d Cir. 2004) (holding that *Seibert* did not apply because the failure to give *Miranda* warnings "seem[ed] much more likely to have been a simple failure to administer the warnings rather than an intentional withholding that was part of a larger, nefarious plot"). *But cf. United States v. Fellers*, 397 F.3d 1090, 1098 (8th Cir. 2005) (applying the plurality's test but finding both the plurality's and Justice Kennedy's tests satisfied).

---

[5]Because Mashburn conceded that the question-first strategy was not deliberately employed by the agents here, we need not reach the issue of which party bears the burden of proving whether the strategy was deliberately employed.

D.

Here, the district court found no evidence that the agents' failure to convey *Miranda* warnings to Mashburn was deliberate or intentional. *See* J.A. 85 ("[T]he Court finds no intent in this case on the part of [Agent] Brown."); *id.* ("The Court can't find . . . any intent to do wrong."); *id.* at 86 ("I do not find it in this case, that it was inappropriate conduct."). Therefore, the admissibility of Mashburn's statements is governed by *Elstad*.

*Elstad* instructs that "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion" as to any subsequent, postwarning statement. *Elstad*, 470 U.S. at 314. Rather, "[t]he relevant inquiry is whether, in fact, the second statement was also voluntarily made." *Id.* at 318.

Mashburn concedes that his second, postwarning statement "was certainly voluntary." Appellant's Br. at 17. He argues, however, that the agents obtained his initial, prewarning statement using the deliberately coercive or improper tactics alluded to in *Elstad*. *See Elstad*, 470 U.S. at 314. Specifically, he contends that his initial statement was "the product of an implied threat/promise," Appellant's Br. at 18, because the "agents sat [him] down and told him he was in very serious trouble, looking at five years for the gun on top of five years for the methamphetamine," *id.* at 14, and that the "only way that [he could] actually help [himself] in a federal system is, number one, by acceptance of responsibility, and number two is substantial assistance," J.A. 48. We reject this contention.

"[G]overnment agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary." *United States v. Shears*, 762 F.2d 397, 401 (4th Cir. 1985). Here, the agents made no specific promises of leniency in exchange for Mashburn's statement. *See id.* at 402 & n.5 (discussing circumstances under which specific promises, if not kept, could render a statement involuntary). Rather, the agents simply informed Mashburn of the gravity of his suspected offenses and the benefits of cooperation under the federal system. *Cf. United States v. Pelton*, 835 F.2d 1067, 1073 (4th Cir. 1987) ("General encouragement

to cooperate is far different from specific promises of leniency."). Any coercion that Mashburn may have felt was not the product of official action, but rather the consequence of the severity of the offenses he chose to commit. *See Elstad*, 470 U.S. at 304-05 (explaining that the Fifth Amendment is not "concerned with moral and psychological pressures to confess emanating from sources other than official coercion"). We hold that Mashburn's postwarning statements were voluntary and properly considered by the district court.

### III.

For the reasons stated above, we affirm the decision of the district court.

*AFFIRMED*