877 A.2d 1095

Brian Christopher COOPER

v.

STATE of Maryland.

No. 1353, Sept. Term, 2003.

Court of Special Appeals of Maryland.

July 6, 2005.

Allen E. Burns ( Stephen E. Harris, Public Defender on the brief), Baltimore, for appellant.

Devy Patterson Russell (J. Joseph Curran, Jr., Attorney General on the brief), Baltimore, for appellee.

Argued before EYLER, DEBORAH S., BARBERA, MEREDITH, JJ.

BARBERA, J.

This murder case involves application of the Supreme Court's recent decision in *Missouri v. Seibert*, 542 U.S. 600, 124 S.Ct. 2601, 159 L.Ed.2d 643 (2004). With *Seibert*, the Court reinforced the protections afforded by *Miranda v. Arizona*, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). *Miranda*, of course, held that a custodial confession obtained without benefit of proper warnings and waiver of the rights to silence and representation by counsel is generally barred from use by the State at trial.

In *Seibert*, the Supreme Court struck down the two-step, "question first" interrogation strategy employed by some police. This strategy is one in which the police purposefully withhold *Miranda* warnings during a custodial interrogation until after an incriminating statement is obtained, then administer proper *Miranda* warnings, secure a proper waiver, and elicit a second confession, ostensibly admissible in court. The Court held in *Seibert* that, when such a technique is used, the second confession must be suppressed because the "midstream recitation of warnings after interrogation and unwarned con-

fession could not effectively comply with *Miranda's* constitutional requirement." 124 S.Ct. at 2605.

In the present case, the police engaged in the question first strategy when interrogating appellant, Brian Christopher Cooper. Two statements were produced during the interrogation, the first unwarned, the second, warned. The State did not attempt to introduce the first statement at appellant's trial, but, over appellant's objection, did introduce the second statement, to appellant's prejudice. We therefore agree with appellant that his murder conviction and associated weapons convictions must be reversed, and the case returned to the Circuit Court for Baltimore City for a new trial.

## BACKGROUND

On the night of April 16, 2002, appellant, who was then 18 years old, stabbed 21–year–old Elliott Scott in Baltimore City, following an altercation earlier that evening between the two men. Scott died two days later, and the investigation into his murder led the police to suspect appellant as the assailant.

Appellant was arrested on a warrant, approximately one month after the crime. At the police station following his arrest, appellant was subjected to interrogation and gave two statements. On learning that the State planned to use the second of these statements at trial, appellant filed a motion to suppress it, arguing, *inter alia,* that it was obtained in circumvention of *Miranda.*

### The Suppression Hearing

The warrant to arrest appellant issued on May 15, 2002, and, at approximately 5:30 p.m. that day, members of the Southwestern District Narcotics Unit arrested him and took him to the Southwestern District station house. After a short while, appellant was transported to the Homicide Unit in downtown Baltimore.

Appellant arrived at the Homicide Unit at 6:22 p.m. and was initially placed in a secured interview room. Detective William Ritz removed the heavy plastic handcuffs that had bound

appellant's wrists since his arrest. Within ten minutes, however, appellant was escorted into the office of Sargent Barry Grant, where Homicide Unit Detectives Ritz and Michael Baier were waiting for him.

Detective Ritz initiated his interview with appellant sometime before 7:00 p.m. The detective acknowledged that neither at that time nor at any time in the next hour and a half did he or anyone else inform appellant of his *Miranda* rights.

During this 90–minute period, Detective Ritz first filled out an information sheet, with appellant's assistance.[1] The detective also advised appellant that he had been arrested on charges of first degree murder and related weapons violations. The detective then began a "rambling" discourse about the crime and what his investigation had disclosed. Asked to describe this "procedure or process," Detective Ritz stated:

Several things. It's just kind of rambling on. Like I said, I told him [about] my investigation, I had an arrest warrant for him for the homicide of . . . Scott, that had occurred on April 17th. I told him the location. Told him that I had spoken with several people during my investigation and that those individuals that I had spoke[n] with identified him as the person involved in the incident.

I gave him some background information on the victim, portraying the victim as not necessarily a nice guy. That there's two sides to every story, that I had people that had seen him arguing with the victim that evening. I had witnesses that saw him getting out of a vehicle chasing after the victim that evening, and I kept reiterating that there's two sides to every story. At that time he just sat there. At times he had his head down and he wasn't—it wasn't a question and answer type thing. Like I said, I'm just

---

1. The information sheet contained appellant's personal data, information pertaining to his parents and other relatives, his highest level of schooling and that he could read and write, his employment status, that he was not currently under the influence of drugs or alcohol, a description of the clothes he was wearing at the time, and a note about an injury on his arm. The sheet also listed the names of the two detectives who were in the interview room with appellant.

rambling on and talking and talking for approximately an hour and a half.

During this stage of the interview, Detective Ritz showed appellant the face page of the arrest warrant. Detective Ritz also had the approximately two and a half inch homicide file sitting on the desk in the room, where appellant could see it.

Shortly after 9:00 p.m., appellant advised Detective Ritz that he wanted "to tell [] his side of the story." The detective did not attempt to stop appellant from speaking, nor did he issue *Miranda* warnings. Appellant gave the following statement at that time, as recounted by Detective Ritz at the suppression hearing:

[Appellant] made the statement that he was arguing with the victim. He left the area. Went to a girl's house. Saw the victim later but he didn't stab him. The victim started arguing with him and he was inside a vehicle, got out, got back in the car and drove off.

After appellant said this, Detective Ritz "told him to stop what he was saying" because the detective wanted to tape appellant's statement and advise him of his *Miranda* rights.

Appellant agreed to make an audiotaped statement, and the recording system was set up. The audio recording, which was transcribed for the suppression hearing and later introduced at trial, captured Detective Ritz's laying out the background of the investigation, reviewing with appellant what had occurred in the previous 90 minutes, and then, at approximately 9:05 p.m., advising appellant of his *Miranda* rights.

Detective Ritz gave appellant a written explanation of his rights and asked him to "familiarize himself with" them. Then, the detective informed appellant of his rights and asked him to put his initials next to each line stating his rights, to indicate that he understood each of them. Appellant's name or initials appear next to each of his rights.

Following this, Detective Ritz elicited a statement from appellant through a series of questions and answers. Twenty-

two minutes elapsed during the taking of this statement. Below is the pertinent portion of the exchange:

Ritz: Okay, ... what I said before about there's two sides to every story. It's extremely important, I wasn't there when all of this took place. My responsibility in, in this investigation is re-creating what happened that night. And I do that from physical evidence on the scene, from witnesses that are located and interviewed and any other forensic evidence that is collected and I try to re-create what happened that night. You had indicated that you were involved with a, in an argument with [the victim], is that true?

[Appellant]: Yes.

Ritz: How long have you known [the victim]?

[Appellant]: A long time.

Ritz: What's a long time to you?

[Appellant]: About six years.

Ritz: About six years? ... During the six years of knowing [the victim], how would you describe your relationship with him?

[Appellant]: I never say nothing to him.

\* \* \*

Ritz: Okay going back to the evening of Tuesday, April the sixteenth, you were in the area of the hack[2] stand at Fairmount and Franklintown Road?

[Appellant]: Yes.

Ritz: Tell me what happened Brian?

[Appellant]: He walked up, he said something to me, we started arguing, I got in a hack.

Ritz: Okay, if I can just stop you for a second. You said you walked up, he said something to you. What did he say to you?

---

2. The word "hack" is a slang term for an un-licensed taxicab. *Knight v. State*, 381 Md. 517, 527 n. 5, 850 A.2d 1179 (2004).

[Appellant]: [”]What you looking at?[”]

Ritz: And what was your response?

[Appellant]: What you mean?

Ritz: And what did he say?

[Appellant]: [”]What's up?[”]

Ritz: Did you get the impression that, well what was your impression that he was trying to do?

[Appellant]: He was trying to fight.

Ritz: He was trying to fight?

[Appellant]: Yeah.

Ritz: Did it seem like he was showing off for anyone?

[Appellant]: No not really, I don't know, I just thought he was drunk.

Ritz: You thought he was drunk? What made you think that [he] was drunk or gave you that impression?

[Appellant]: I don't know. He be, they always be drinking over there a lot. I don't know.

Ritz: Okay I didn't know if his speech was slurred or just his actions made you think that he was drunk and was trying to pick a fight with you.

[Appellant]: Yes.

Ritz: I'm sorry.

[Appellant]: Yes.

Appellant then described how he got into a hack and was driven to his grandmother's house. He remained there for two to three minutes, then returned to the hack. The statement resumed with the following:

[Appellant]: I go down Fairmount and Catherine and [the driver] was gonna make the left to go up Fayette, so I could get back to Franklintown Road on the way we usually make it home. And I see the person or LT [*i.e.,* the victim]. And he say something to me, so the hack stopped.

Ritz: Okay what does he say to you Brian?

[Appellant]: He said, "What's up?"

Ritz: And do you. . . .

[Appellant]: In terms like he was still trying to fight.

Ritz: Okay can you describe his tone of voice it was like, you said he, as if he was still trying to fight?

[Appellant]: He sound a little hyper.

Ritz: Okay so the hack stops the car.

[Appellant]: Yeah.

Ritz: Then what happened?

[Appellant]: I get out the hack and when I get out the hack he take off. And I looked and see him running up an alley and my hack started pulling off like he was leaving me. So I got back in my hack and went home.

Ritz: Okay when [the victim] takes off running, you said he's on Catherine Street walking towards Fayette, is that true? You're coming down Fairmount Avenue and you make a left-hand turn onto Catherine?

[Appellant]: Yeah, yes.

Ritz: Yes? Okay. You see him walking along, is he walking with anyone else?

[Appellant]: I don't remember.

Ritz: Okay. As you see him, he says something to you?

[Appellant]: Yeah.

Ritz: Okay, do you get out of the car at that time?

[Appellant]: No, the car, I tell the hack [to] stop. And when it stopped, I looked at him and he just started running. That's when I standed up and shut the hack door and looked. He went up a[n] alley, I just got back in the hack and left.

Ritz: Okay at anytime Brian from when you come back around to Catherine Street and you see [the victim] again, do you get in any sort of physical confrontation with him or anyone?

[Appellant]: No.

As the statement continued, appellant said that he was unarmed, did not physically confront Scott, and only orally confronted him from a distance of six feet away. Appellant

proclaimed his innocence, stating that, when he last saw Scott, he was uninjured and running up an alley.

On cross-examination, Detective Ritz explained why he conducted the first part of the interview as he did: "I was in no rush to anger him, upset him in any way where he [would] just kind of shut me down and [say] the heck with it. You know, I want an attorney. . . ." Defense counsel pursued this with the detective:

[DEFENSE COUNSEL:] Well, let me rephrase the question. Maybe I will make it a little less objectionable. You didn't want him to ask for a lawyer because that would have been the end of that, correct?

[RITZ:] Yes, sir, whether it was in the first five minutes or the first two hours or twelve hours later.

[DEFENSE COUNSEL:] And that's the reason why during this one and a half hour period, hour period, you didn't say anything about Miranda and lawyers, correct?

[RITZ:] That's correct, because as soon as he was brought out of the interview room I didn't take him into the room and advise him of his rights, that's correct.

[DEFENSE COUNSEL:] Because you felt it was, I guess a good technique to get his trust? I mean you weren't yelling at him, were you?

[RITZ:] No, sir.

[DEFENSE COUNSEL:] Sitting across the table?

[RITZ:] Yes, sir, I was trying to gain his trust. Sometimes people when they come in contact with the police they have a stereo type of police. I wanted him to get to know me and get to know him, you know, as well as him feeling comfortable with talking with me.

Appellant presented two grounds for suppression of the taped statement. He argued, first, that it was the product of an unlawful inducement by Detective Ritz and the narcotics officers who arrested him. Second, pertinent to this appeal, he argued that the statement was the unlawful fruit of a *Miranda* violation. After hearing the parties' arguments for

and against suppression of the statement, the motions court ruled that appellant's post-warned statement was voluntary. The court then turned to appellant's claim that the statement was taken in violation of *Miranda:*

> Now, with respect to his right to remain silent, was he Mirandized, the State must prove by a preponderance of the evidence that [appellant] has been warned adequately and waived the privilege against self incrimination knowingly and intelligently under the totality of the circumstances. There must be some police coercive activity to say that [appellant's] waiver was not voluntary. There was none here.
>
> It was voluntary. Again the starting point is that [appellant] himself said it was. Secondarily, [appellant] was most certainly under interrogation when Detective Ritz was talking to him for 90 minutes. However, no statement was made during that time.[3]
>
> The statement to be offered by the State was made after the Miranda warning. And Fried versus State, as well the other cases cited to this Court by the State, puts to rest any thought that this statement was coerced because of Detective Ritz'[s] interrogation during the 90 minutes.
>
> For these reasons, the State has met its burden and the statement is admissible.

### *The Trial*

Tony Alexander, the hack driver who was in appellant's company several times on the night of the stabbing, testified as one of the State's primary witnesses. Alexander first saw appellant, one of his regular hack customers, with the victim, Scott, near the hack stand located at the corner of Fairmont Avenue and Franklintown Road. Scott was "cussing and fussing" and calling appellant names like "bitch" and "punk."

---

**3.** This factual statement by the court is belied by the record. As we have recounted (and the State does not disagree), appellant did give an unwarned statement at the end of the 90-minute period, and only then did Detective Ritz issue *Miranda* warnings.

Alexander heard appellant respond, "What you talking about," and, "You better go ahead with that." Shortly after this, appellant ran to Alexander's car and asked for a ride.

Alexander drove appellant to his grandmother's house. Appellant went into the house, and returned to the car after "a minute or two." Appellant sat in the front passenger's seat and asked to be taken to Fayette Street, a block from Scott's residence. Alexander saw nothing in appellant's hand.

Upon reaching Fayette Street, appellant talked to some females, while remaining in the car. He then asked Alexander to take him to the McCullogh Homes, near the spot where appellant and Scott had exchanged words earlier in the evening.

As he was driving to that destination, Alexander saw Scott standing at the corner of Fayette and North Catherine Street. He was with a female whom Alexander recognized as having been with Scott during appellant's first encounter with him. Scott saw appellant and "started cussing and fussing again," and asked, "What the fuck you going to do now?"

Alexander stopped the car. After a few seconds, appellant got out and stood in the doorway of the car, about 10 to 15 feet away from Scott. Alexander saw that Scott had a bag in one hand and, with the other, reached into his pocket. Appellant put his hand into his own pocket, as well.

Alexander testified that he thought at the time that appellant was "bluffing." Alexander watched as Scott and appellant just "stood there for a few seconds," then Scott "took off running." After a second, appellant closed the car door and ran after Scott. Scott turned into an alley behind a building and appellant followed him.

After "a second or two," appellant returned from the alley and haled Alexander for a ride. Saying nothing, appellant got back into the front passenger seat. Alexander then drove appellant home.

Natisha Brown is the woman who was with Scott on the night of the stabbing. She testified that, as she and Scott

were "walking around" that night, Scott stopped at the hack stand to talk to a group of men who were standing there. She heard Scott say "what's up" in a "loud and aggressive" manner, and, when he rejoined her, he was "mad" and "fussing."

Brown and Scott resumed walking together when, at the corner of Fayette and Catherine Streets, a car pulled up and a "young man" inside it called, "what's up" to Scott. Scott responded, "what's up," and the young man, whom she could not identify, got out of the car and put his hand in his pocket. Scott took off running and the young man "ran behind him." A few seconds later, Brown saw the young man emerge from the alley and run back to the car.

Scott was stabbed while in the alley. Brown did not witness the stabbing, but soon after the young man left the alley, she heard screams coming from Scott's house, nearby. She ran to Scott's house and saw him there, bleeding from his side.

Scott's sister and mother, Fredericke Scott, were home at the time. Ms. Scott testified that her son said he was stabbed. He was bleeding profusely from his wounds and spitting up blood. The paramedics were called, and Scott was taken by ambulance to the Shock Trauma Unit of the University Maryland Hospital.

Ms. Scott also testified, over defense objection that the statement was not an "excited utterance," that, almost an hour after her son arrived at the hospital, her husband asked Scott "who did this to [you]." To this, Scott replied that the assailant "had braids in his hair and he had funny eyes," and a "medium skin tone." We shall say more about this testimony, *infra.*

Scott died of his wounds on April 18, 2002. The autopsy disclosed that the cause of death was multiple stab wounds, which were inflicted by a double-edged blade.

Detective Ritz testified about the homicide investigation and his interrogation of appellant at the police station. The audiotape of appellant's post-*Miranda* warned statement was played for the jury, and the transcript of it was admitted into

evidence. The transcript was sent to the jury room for the jury's use during deliberations.

The jury convicted appellant of first degree murder, wearing and carrying a concealed weapon, and carrying a deadly weapon with intent to injure. He was sentenced to life imprisonment on the murder conviction and to a consecutive three years' imprisonment on the latter of the two weapons convictions.

On appeal, appellant challenges the admissibility of his post-*Miranda* warned statement to Detective Ritz and Ms. Scott's testimony concerning the victim's description of his assailant.

## DISCUSSION

### I.

Appellant's first complaint rests upon *Seibert.* He urges that the motions court erred when it declined to suppress his post-*Miranda* warned statement, which expanded upon the pre-warned statement he made at the end of the first stage of the interrogation. The State responds that the motions court acted correctly, because the facts of the present case distinguish it from the rule of *Seibert.* As we shall discuss, appellant has the better part of the argument.

### A.

We note at the outset the standard by which we review this issue. We rely solely on the record developed at the suppression hearing. *Alston v. State,* 159 Md.App. 253, 261, 858 A.2d 1100 (2004). "[W]e view the evidence and inferences that may be reasonably drawn therefrom in a light most favorable to the prevailing party on the motion," and we reverse a court's factual findings only when they are clearly erroneous. *State v. Rucker,* 374 Md. 199, 207, 821 A.2d 439 (2003). Although we extend great deference to the motion court's findings of fact, determinations regarding witness credibility, and weighing of the evidence, we make our own independent constitutional appraisal of the law as it applies to the

facts of the case. *Alston,* 159 Md.App. at 261–62, 858 A.2d 1100.

## B.

The Supreme Court's decision in *Seibert* is best considered in light of another decision of the Court that predates *Seibert* by nearly two decades, *Oregon v. Elstad,* 470 U.S. 298, 105 S.Ct. 1285, 84 L.Ed.2d 222 (1985). We therefore begin our discussion with a review of that decision. In *Elstad,* the Court considered "whether an initial failure of law enforcement officers to administer the warnings required by *Miranda* [], without more, 'taints' subsequent admissions made after a suspect has been fully advised of and has waived his *Miranda* rights." *Id.* at 300, 105 S.Ct. 1285. In that case, Michael James Elstad was arrested at his parents' home for burglary. While Elstad was still in his parents' living room and one officer was explaining to Elstad's mother that a warrant had been issued for his arrest, a second officer informed Elstad that he thought Elstad was involved in the burglary. To this statement Elstad responded, "Yes, I was there." *Id.* at 301, 105 S.Ct. 1285. Evidently, the officer who put this question to Elstad was unsure that he was in custody at the time. *Id.* at 315–16, 105 S.Ct. 1285.

Elstad was taken to the Sheriff's headquarters and, approximately one hour later, was informed of his *Miranda* rights. After responding that he understood his rights, Elstad gave a full confession to his involvement in the burglary. Elstad sought to have suppressed the statement he made at his home, as well as his post-*Miranda* confession. His argument for suppression of the post-warned statement was that his unwarned statement had "let the cat out of the bag" and thereby "tainted the subsequent confession as 'fruit of the poisonous tree.'" *Id.* at 302, 105 S.Ct. 1285.

The motions court suppressed Elstad's first statement, but ruled that the post-*Miranda* statement was admissible because it was "given freely, voluntarily and knowingly by [Elstad] after he had waived his right to remain silent and

have counsel present. . . ." *Id.* The Oregon Court of Appeals reversed the motions court, agreeing with Elstad that "the 'cat was sufficiently out of the bag to exert a coercive impact on [his] later admissions.' " *Id.* at 303, 105 S.Ct. 1285 (citation omitted).

The Supreme Court reversed the Oregon Court of Appeals. *Id.* at 300, 105 S.Ct. at 1285. Justice O'Connor, writing for the majority, declared it "an unwarranted extension of *Miranda* to hold that a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." *Id.* at 309, 105 S.Ct. at 1285. Justice O'Connor pointed out that, although *"Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* Absent coercive or improper actions on the part of the officers performing the interrogation, "a careful and thorough administration of *Miranda* warnings serves to cure the condition that rendered the unwarned statement inadmissible." *Id.* at 310–11, 105 S.Ct. 1285.

The *Elstad* Court noted that the fruits doctrine, applied in such cases as *Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441 (1963), and *Brown v. Illinois,* 422 U.S. 590, 95 S.Ct. 2254, 45 L.Ed.2d 416 (1975), was developed in the context of the Fourth Amendment exclusionary rule, where the objective is to deter unreasonable searches, no matter how probative their fruits. The objective of the Fifth Amendment, by contrast, is to bar use of compelled statements. *Miranda,* moreover, adopted an exclusionary rule that "sweeps more broadly" than does the Fifth Amendment, by establishing an irrebuttable presumption that unwarned statements obtained through custodial interrogation are compelled. *Elstad,* 470 U.S. at 305–07, 105 S.Ct. 1285. Violation of *Miranda's* safeguards, the *Elstad* Court declared, in and of itself does not create a coercive atmosphere that automatically

renders involuntary any subsequent, properly warned statement. The relevant inquiry should be "whether, in fact, the second statement was also voluntarily made[,]" considering "the surrounding circumstances and the entire course of police conduct with respect to the suspect. . . ." *Id.* at 318, 105 S.Ct. 1285. The Court held that Elstad's second confession was voluntary and that it complied with *Miranda;* consequently, it was admissible. *Id.*

*Elstad,* it must be remembered, dealt only with "a simple failure to administer the warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will[.]" *Id.* at 309, 105 S.Ct. 1285. The Court emphasized "that, *absent deliberately coercive or improper tactics in obtaining the initial statement,* the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id.* at 314, 105 S.Ct. 1285 (emphasis added). Moreover, the "subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement *ordinarily* should suffice to remove the conditions that precluded admission of the earlier statement." *Id.* (emphasis added). Absent coercion or deliberate tactics, "the finder of fact may reasonably conclude that the suspect made a rational and intelligent choice whether to waive or invoke his rights." *Id.*

Nearly 20 years after *Elstad,* the Supreme Court was presented in *Seibert* with the situation hypothesized in *Elstad:* the failure of police to administer *Miranda* warnings under " 'circumstances calculated to undermine the suspect's ability to exercise his free will.' " 124 S.Ct. at 2610 n. 4 (quoting *Elstad,* 470 U.S. at 309, 105 S.Ct. 1285). The *Seibert* Court held that the two-step interrogation tactic used by the police to obtain a confession from Patrice Seibert violated *Miranda.* *Id.* at 2605–07.

Seibert had a twelve-year-old son, Jonathan, who suffered from cerebral palsy. When Jonanthan died, Seibert feared that neglect charges would be filed against her. She, together

with two of her teenage sons and two friends, devised a plan to conceal Jonathan's death by burning the family's mobile home, with Jonathan's body inside. To make it appear that Jonathan was not alone when he died, the plan entailed leaving Donald Rector, a mentally ill teenager who was living with the family, in the mobile home when it was set ablaze. Seibert's two sons set fire to the mobile home and Rector died inside the burning structure. *Id.* at 2605–06.

Five days later, Seibert was arrested for the death of Rector. The arresting officer was instructed by Officer Richard Hanrahan not to administer *Miranda* warnings to Seibert. She was transported to the police station and was questioned by the interrogating officer for 30 to 40 minutes, who repeatedly stated to Seibert that "Donald [Rector] was also to die in his sleep." *Id.* at 2606. Seibert finally admitted that she knew that Rector was meant to die in the fire. *Id.*

Seibert was given a 20–minute break during which the interrogating officer turned on a tape recorder, informed her of her *Miranda* rights, and obtained from her a signed waiver of those rights. The officer resumed questioning Seibert by first confronting her with her pre-*Miranda* statements. The officer then obtained a full confession from Seibert. *Id.*

Seibert was charged with first degree murder for her part in Rector's death, and subsequently sought to have her pre- and post-*Miranda* statements suppressed. "At the suppression hearing, Officer Hanrahan testified that he made a 'conscious decision' to withhold *Miranda* warnings, thus resorting to an interrogation technique" of question first until a confession is obtained, then advise the suspect of his or her rights, and then repeat the original question until the answer that has already been provided is repeated. *Id.*

The trial court suppressed Seibert's pre-warning statement, but allowed her post-warning statements to be admitted. On appeal, the intermediate appellate court, following *Elstad,* affirmed. The Supreme Court of Missouri reversed. *Id.*

The Supreme Court affirmed the Missouri court. The Supreme Court's decision produced four opinions: the plurali-

ty opinion (Souter, J., joined by Stevens, Ginsburg, and Breyer, JJ); two concurring opinions (Breyer, J.), (Kennedy, J.); and a dissenting opinion (O'Connor, J., joined by Rehnquist, CJ, Scalia, and Thomas, JJ). *Id.* at 2601–02. As we explain below, Justice Kennedy's concurring opinion provides the test that guides our decision in this case.

The plurality began with a review of *Miranda,* observing that the Court had, in that case, established a rule that "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Id.* at 2608. The plurality pointed out that the purpose behind *Miranda* was " 'to reduce the risk of a coerced confession and to implement the Self–Incrimination Clause,' " so an " 'accused must be adequately and effectively apprised of his rights and the exercise of those rights must be fully honored[.]' " *Id.* (citations omitted).

The plurality observed that "[t]he technique of interrogating in successive, unwarned and warned phases" is a popular technique promoted by individual police departments and a national police training organization.[4] *Id.* The admissibility of a warned confession obtained through this technique requires that "attention must be paid to the conflicting objects of *Miranda* and [the] question-first" technique. *Id.* at 2609. "The threshold issue when interrogators question first and warn later is thus whether it would be reasonable to find that in these circumstances the warnings could function 'effectively' as *Miranda* requires." *Id.* at 2610; *see also id.* at 2612 (characterizing the threshold issue as "whether *Miranda* warnings delivered midstream could be effective enough to

---

4. The Illinois Police Law Manual put out by the Police Law Institute "instructs that 'officers may conduct a two-stage interrogation.... At any point during the pre-*Miranda* interrogation, usually after arrestees have confessed, officer may then read the *Miranda* warnings and ask for a waiver. If the arrestees waive their *Miranda* rights, officers will be able to repeat any *subsequent* incriminating statements later in court.' " *Seibert,* 124 S.Ct. at 2608–09.

accomplish their object"). Unless the circumstances are such that the *Miranda* warnings could function effectively, "there is no practical justification for accepting the formal warnings as compliance with *Miranda,* or for treating the second stage of interrogation as distinct from the first, unwarned and inadmissible segment." *Id.* at 2610.

The *Seibert* plurality compared the case before it to *Elstad,* characterizing the latter as involving "a good-faith *Miranda* mistake ... open to correction by careful warnings ... [and] posing no threat to warn-first practice generally." *Id.* at 2612. The plurality noted that the facts of the case before it were "[a]t the opposite extreme [of the facts in *Elstad*]," and "by any objective measure reveal a police strategy adapted to undermine the *Miranda* warnings." *Id.*

The plurality fashioned a multi-factored test for use in deciding whether statements made during continuing interrogations are admissible in light of belated *Miranda* warnings. The plurality's test looks to several factors "that bear on whether *Miranda* warnings delivered midstream could ... accomplish their object." *Id.* These factors include:

> the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the first and the second [interrogations], the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first.

*Id.*

Applying that test to the circumstances of *Seibert's* two-step interrogation, the plurality concluded: "These circumstances must be seen as challenging the comprehensibility and efficacy of the *Miranda* warnings to the point that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk." *Id.* at 2613.

Justice Kennedy wrote separately, supplying the vote necessary to make a majority. In his concurrence, Justice Kennedy eschewed the plurality's multi-factor test, which would apply

to both intentional and unintentional two-stage interrogations, as a test that "cuts too broadly." *Id.* at 2616. Justice Kennedy set forth "a narrower test applicable only in the infrequent case, such as we have here, in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.*

█ " '[W]hen a fragmented Court decides a case and no single rationale explaining the result enjoys the assent of five Justices, the holding of the Court may be viewed as that position taken by those Members who concurred in the judgments on the narrowest grounds.' " *Grutter v. Bollinger,* 539 U.S. 306, 325, 123 S.Ct. 2325, 156 L.Ed.2d 304 (2003) (quoting *Marks v. United States,* 430 U.S. 188, 193, 97 S.Ct. 990, 51 L.Ed.2d 260 (1977)); *accord Romano v. Oklahoma,* 512 U.S. 1, 9, 114 S.Ct. 2004, 129 L.Ed.2d 1 (1994) (citing the concurring opinion of Justice O'Connor in *Caldwell v. Mississippi,* 472 U.S. 320, 341, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), and stating: "As Justice O'Connor supplied the fifth vote in *Caldwell,* and concurred on grounds narrower than those put forth by the plurality, her position is controlling").

Because Justice Kennedy's opinion sets forth the narrowest grounds on which the case is decided, it represents the holding of the Court; it is therefore Justice Kennedy's test that applies to this and like cases. *See United States v. Mashburn,* 406 F.3d 303, 308–09 (4th Cir.2005) (holding that Justice Kennedy's opinion in *Seibert* sets forth the applicable rule); *United States v. Stewart,* 388 F.3d 1079, 1086 (7th Cir.2004) (same); *but cf. United States v. Fellers,* 397 F.3d 1090, 1098 (8th Cir.2005) (applying the plurality's multi-factored test, but finding the second, warned statement admissible under both the plurality's and Justice Kennedy's tests).[5]

---

**5.** One United States District Court judge disagrees that Justice Kennedy's concurrence represents the Court's holding. *See United States v. Cohen,* 372 F.Supp.2d 340, 353 (E.D.N.Y.2005) (expressing the view that Justice Kennedy's test does not represent "the narrowest incarnation of the *Seibert* rule, because the plurality explicitly refused to rely on the subjective intent of the officer in making its determination," and the dissenting Justices agreed with the plurality on that point; further,

■ Justice Kennedy made clear in his concurrence that "[t]he admissibility of postwarning statements should continue to be governed by the principles of *Elstad* unless the deliberate two-step strategy was employed." *Seibert*, 124 S.Ct. at 2616. But, "[i]f the deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* Such curative measures, Justice Kennedy explained, "should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* He cited, as examples of curative measures, "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning. . . ." *Id.* A break of this sort "may suffice in most circumstances, as it allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* Justice Kennedy posited, as a possible alternative curative measure, "an additional warning that explains the likely inadmissibility of the prewarning custodial statement. . . ." *Id.*

Because "[n]o curative steps were taken in this case," Justice Kennedy concurred with the plurality that "the post-warning statements are inadmissible and the conviction cannot stand." *Id.*

### C.

■ Turning to the case before us, the State does not argue that this case is controlled by *Elstad,* and we agree with the State's implied concession that it does not. As we see it, the facts here are in material respects identical to those in *Seibert.*

■ We start our analysis with a fact not in dispute: the protections given by *Miranda* certainly applied to the first 90 minutes of the exchange between Detective Ritz and appel-

---

"Justice Kennedy laid out an analysis which is 'simply different' than that articulated by the plurality, not a logical subset").

lant.[6] The *Miranda* protections come into play only when a person is subjected to custodial interrogation or its functional equivalent. *Rhode Island v. Innis,* 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980); *Blake v. State,* 381 Md. 218, 231, 849 A.2d 410 (2004), *cert. granted,* —— U.S. ——, 125 S.Ct. 1823, 161 L.Ed.2d 722 (2005). Without the presence of both custody *and* interrogation, the police are not bound to deliver *Miranda* warnings and obtain a proper waiver of the rights to silence and counsel before questioning a suspect.

Appellant was undeniably in custody, having been arrested earlier that evening and transported, after a short stop at Southwestern Police Station, to the Homicide Unit. Moreover, he was subjected at this time to interrogation or, at the least, "its functional equivalent." *See Innis,* 446 U.S. at 301, 100 S.Ct. 1682 ("[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.") (footnotes omitted); *see also Drury v. State,* 368 Md. 331, 793 A.2d 567, *cert. denied,* 537 U.S. 942, 123 S.Ct. 341, 154 L.Ed.2d 249 (2002). Indeed, the State makes no argument that the first stage of Detective Ritz's interview was not an interrogation, or that he was not in custody at the time.

Detective Ritz's description of the interrogation brings it squarely within the purview of *Seibert.* Indeed, though we have concluded that Justice Kennedy's test is the applicable test, what occurred in this case fails under both the plurality's multi-factor test, 124 S.Ct. at 2612, and Justice Kennedy's test, *id.* at 2616.

---

6. This fact makes this case different from the only other reported decision to date in Maryland that addresses *Seibert, Allen v. State,* 158 Md.App. 194, 857 A.2d 101 (2004), *aff'd,* 387 Md. 389, 875 A.2d 724 (2005). In *Allen,* we held that *Seibert* was inapplicable to statements the appellant made during a second, post-warning interview with the police, because the appellant had not been in custody during the first interview. 158 Md.App. at 236, 857 A.2d 101.

The interrogation began without *Miranda* warnings and continued for 90 minutes. During this time, Detective Ritz told appellant, among other things, that witnesses "saw him getting out of a vehicle chasing after the victim that evening." The interrogation proceeded, uninterrupted, until appellant gave a statement that placed him at the scene, arguing with the victim. Then, but only then, did the detective stop appellant from saying more. The only break in the interrogation was to set up the audiotape recording system, give appellant the *Miranda* warnings, and secure a waiver from him, thereby providing him with even less of an interruption than the 20–minute break given in *Seibert.* Interrogation then resumed, conducted by the same officer, in the same environment. And, much as in *Seibert,* Detective Ritz began the second stage of the interrogation by harkening back to appellant's unwarned statement ("You had indicated that you were involved with a, in an argument with [the victim], is that true?"), as if this part of the interrogation was merely a continuation of the first. Further, of import under Justice Kennedy's test, Detective Ritz candidly acknowledged that he intentionally withheld the reading of the *Miranda* warnings during the first 90–minute stage of the interrogation, for fear that appellant would refuse to talk or ask for a lawyer.

This case stands in stark contrast to those cases in which the police unintentionally violated *Miranda,* and sometime later secure a confession preceded by proper *Miranda* warnings and waiver. *See, e.g., Mashburn,* 406 F.3d at 309–10 (noting, in a case involving a *Seibert* challenge, that the district judge "found no evidence that the agents' failure to convey *Miranda* warnings to Mashburn was deliberate or intentional," and rejecting Mashburn's contention that the police used deliberately coercive tactics in obtaining the first, unwarned statement); *Fellers,* 397 F.3d at 1097–98 (applying the *Seibert* plurality test to hold that Fellers's post-warned statement was admissible because the prior unwarned statement was elicited at Fellers' home, the jailhouse interrogation took place almost one hour later, and though there was some overlap between the unwarned and post-warned statements,

the latter addressed different allegations; noting also that the post-warned statement comported with Justice Kennedy's test, "[b]ecause there is no evidence that the officers in this case employed such a deliberate strategy...."); *United States v. Hernandez–Hernandez*, 384 F.3d 562, 566–67 (8th Cir.2004) (applying *Seibert* and holding that the five-day lapse in time between the unwarned and warned statement and the change in location and in interrogating personnel rendered the post-warned statement admissible because, under these circumstances, the *Miranda* warnings "were effective enough to accomplish their purpose"); *Reinert v. Larkins*, 379 F.3d 76, 91 (3rd Cir.2004) (holding that Reinert's case more closely resembles *Elstad* than *Seibert*, because the officer's failure to provide warnings before obtaining the first statement "seems much more likely to have been a simple failure to administer the warnings rather than an intentional withholding that was part of a larger, nefarious plot"); *Johnson v. State*, 829 N.E.2d 44, 46, (Ind.Ct.App.2005) (holding that the officer's "failure to obtain a valid waiver with regard to the first statement involved a good-faith *Miranda* mistake open to correction by careful warnings, and therefore, did not render the second statement inadmissible").

This case is more like *United States v. Aguilar*, 384 F.3d 520 (8th Cir.2004). In that case, the court held that *Miranda* was violated when the police used the two-step interrogation strategy. The court analyzed the facts under both the *Seibert* plurality's and Justice Kennedy's tests. The court concluded that *Miranda* was violated because "the first questioning session consisted of more than routine booking questions, included some good cop/bad cop questioning tactics, and lasted approximately ninety minutes"; the "two interrogations were not separate in time"; and they were conducted by the same officers. *Id.* at 524–25. Further, under Justice Kennedy's test, "the method and timing of the two interrogations establish intentional, calculated conduct by the police." *Id.* at 525; *see also Crawford v. State*, 100 P.3d 440, 450 (Alaska Ct.App. 2004) (holding that, viewed objectively, "Crawford was subjected to a continuing interrogation about his possession of

cocaine, with *Miranda* warnings inserted midstream, with barely an interruption, and after Crawford had already confessed to this crime," thereby rendering the *Miranda* warnings ineffective).

We conclude that the case before us is the "infrequent case" to which Justice Kennedy referred, "in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Seibert*, 124 S.Ct. at 2616. Like the interrogating officer in *Seibert*, Detective Ritz made a conscious decision to withhold *Miranda* warnings until appellant gave a statement implicating himself in the crime. Moreover, the second, warned statement followed on the heels of the unwarned statement, without any curative measures designed to ensure that a reasonable person in appellant's position "would understand the import and effect of the *Miranda* warning. . . ." *Id.* We hold, therefore, that appellant's post-warned statement violated *Miranda* and should not have been admitted at his trial. Consequently, we must reverse appellant's conviction and remand for a new trial, at which this statement may not be admitted during the State's case-in-chief.[7]

## II.

 Appellant also challenges the trial court's ruling allowing Ms. Scott to repeat her son's description of his assailant, under the guise of an "excited utterance." Because this issue may arise on retrial, we shall address it.

Hearsay is defined in Maryland Rule 5–801(c) as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Maryland Rule 5–803(b)(2) provides that an "excited utterance" is an exception to the general rule

---

7. We recognize that the motions court did not have the benefit of *Seibert* when it decided this case and, so, was not focused on the relevance of the detective's use of a deliberate, two-stage interrogation tactic. The completeness of the record, and the lack of any dispute in the facts concerning the issue, however, permit us to decide the issue.

that hearsay evidence is inadmissible at trial. Defined as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition" in question, Md. Rule 5–803(b)(2), the rationale behind the "excited utterance" exception is that the inherent untrustworthiness of hearsay is overcome when the circumstances are such that they render the declarant's reflective capabilities inoperative. *Parker v. State*, 365 Md. 299, 313, 778 A.2d 1096 (2001).

"'A statement may be admitted under [the excited utterance] exception if "the declaration was made at such a time and under such circumstances that the exciting influence of the occurrence clearly produced a spontaneous and instinctive reaction on the part of the declarant ... [who is] still emotionally engulfed by the situation...."'" *West v. State*, 124 Md.App. 147, 162–63, 720 A.2d 1253 (1998), *cert. denied*, 353 Md. 270, 725 A.2d 1068 (1999) (quoting *State v. Harrell*, 348 Md. 69, 77, 702 A.2d 723 (1997)) (quoting *Harmony v. State*, 88 Md.App. 306, 319, 594 A.2d 1182 (1991)). "'It requires a startling event and a spontaneous statement which is the result of the declarant's reaction to the occurrence.'" *Parker*, 365 Md. at 313, 778 A.2d 1096 (quoting *Mouzone v. State*, 294 Md. 692, 697, 452 A.2d 661 (1982)).

In determining whether a statement properly fits within the "excited utterance" exception to the hearsay rule, we look at the totality of the circumstances to determine whether the foundation for its admissibility has been established. The adequacy of the foundation is judged "by the spontaneity of the declarant's statement and an analysis of whether it was the result of thoughtful consideration [or] ... the product of the exciting event." *Parker*, 365 Md. at 313, 778 A.2d 1096 (citation and internal quotation marks omitted).

The record in this case does not establish that the victim's statement describing his assailant in some detail ("braids in his hair," "funny eyes," and "medium skin tone") was made while he was under the stress of excitement caused by the stabbing. What we know from the evidence is that the victim

made the statement while in the hospital, about an hour after the stabbing and before he went into surgery. As described by his mother, the victim was in pain and restless and having some trouble breathing. His statement, however, was not a spontaneous reaction to the stabbing, but, instead, was given in direct response to a question posed by his father. Altogether, the evidence falls short of satisfying the test for admissibility of the statement as an excited utterance. On retrial, the State should not be permitted to elicit the statement under that exception to the hearsay rule.[8]

**JUDGMENT REVERSED. CASE REMANDED TO THE CIRCUIT COURT FOR BALTIMORE CITY FOR A NEW TRIAL.**

**COSTS TO BE PAID BY THE MAYOR AND CITY COUNCIL OF BALTIMORE.**

---

8. We express no view on whether the victim's statement could be admitted under any other hearsay exception, *e.g.*, a dying declaration.