**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

No. 17-4696

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

MOHAMAD JAMAL KHWEIS,

Defendant - Appellant.

Appeal from the United States District Court for the Eastern District of Virginia, at Alexandria. Liam O'Grady, District Judge. (1:16-cr-00143-LO-1)

Argued: May 29, 2020                     Decided: August 11, 2020

Before DIAZ, FLOYD, and RUSHING, Circuit Judges.

Affirmed in part, vacated in part, and remanded by published opinion. Judge Rushing wrote the majority opinion, in which Judge Diaz joined. Judge Floyd wrote a dissenting opinion.

**ARGUED:** John Mann Beal, Chicago, Illinois, for Appellant. Daniel Taylor Young, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee. **ON BRIEF:** G. Zachary Terwilliger, United States Attorney, Raj Parekh, Assistant United States Attorney, OFFICE OF THE UNITED STATES ATTORNEY, Alexandria, Virginia, for Appellee.

RUSHING, Circuit Judge:

In December 2015, Mohamad Jamal Khweis, a twenty-six-year-old American citizen, sold a number of his possessions and, through a series of one-way tickets, traveled to territory in Syria and Iraq controlled by a foreign terrorist organization known as the Islamic State of Iraq and the Levant (ISIL).[1] Khweis spent the next several months training with and supporting ISIL fighters and leaders. On March 14, 2016, Khweis was captured by Kurdish Peshmerga fighters and transported to a Kurdish Counter-Terrorism Directorate (CTD) detention center in Erbil, Iraq.

At the detention center, the Federal Bureau of Investigation (FBI) Assistant Legal Attaché for Iraq, Michael Connelly, interviewed Khweis to gather intelligence about ISIL without providing him *Miranda* warnings. *See Miranda v. Arizona*, 384 U.S. 436, 467–473 (1966). Ten days after Connelly's interviews concluded, a different team of FBI agents interviewed Khweis for purposes of a potential United States criminal prosecution. This second team advised Khweis of his *Miranda* rights before each interview. Khweis waived his rights and made inculpatory statements that the Government later introduced at his trial for conspiring to provide material support or resources to ISIL in violation of 18 U.S.C. § 2339B, providing material support or resources to ISIL in violation of 18 U.S.C.

---

[1] At all relevant times, ISIL was designated by the United States Secretary of State as a foreign terrorist organization. ISIL is also known as the Islamic State of Iraq and Syria (ISIS), the Islamic State (IS), ad-Dawlah al-Islāmiyah fīl-'Irāq wash-Shām (DAESH), and al-Qaeda in Iraq (AQI). *Crosby v. Twitter, Inc.*, 921 F.3d 617, 620 n.1 (6th Cir. 2019). Shortly before Khweis departed for the Middle East, ISIL claimed responsibility for the November 13, 2015 attacks in Paris, France, during which ISIL operatives killed nearly 100 civilians.

§ 2339B, and possessing, using, and carrying firearms during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A). The jury convicted Khweis on all counts, and he was sentenced to 240 months' imprisonment.

Khweis now appeals the admission of his statements to the second team of FBI agents, contending that the midstream *Miranda* warnings he received were ineffective. We affirm because, even assuming the FBI deliberately used a two-step interview strategy, the agents undertook sufficient curative measures to ensure that a reasonable person in Khweis's position would understand the import and effect of the *Miranda* warnings and waiver. However, we must vacate Khweis's Section 924(c) conviction in light of *United States v. Davis*, 139 S. Ct. 2319 (2019), because Khweis's conspiracy offense is not a predicate crime of violence. Therefore, we affirm in part, vacate in part, and remand for resentencing.

I.

A.

Before trial, Khweis moved to suppress his *Mirandized* statements. After a multiday hearing, the district court denied the motion, therefore we view the evidence in the light most favorable to the Government. *See United States v. Abdallah*, 911 F.3d 201, 209 (4th Cir. 2018). We accept the district court's factual findings, which Khweis does not contest on appeal. Br. of Appellant 21.

Evidence at the suppression hearing showed that Kurdish forces held Khweis in custody for violations of Kurdish and Iraqi law, namely joining a terrorist organization and crossing the border without proper documentation. Khweis's detention was authorized by

3

the local court, and he was offered counsel to represent him in the local court system, which he declined.

On March 15, 2016, the day after Khweis's capture, United States Department of State Consular Officer Mark Jasonides visited him. Jasonides inquired about Khweis's well-being and provided him with a fact sheet about the Iraqi legal system. The fact sheet advised, among other things, that, "[i]n Iraq, the usual expectations of presumption of innocence, the right to remain silent[,] and proof of criminal activity 'beyond a reasonable doubt' do not apply." J.A. 882. In conjunction with the fact sheet, Jasonides provided Khweis with a list of lawyers who practice in the Kurdistan region of Iraq. Jasonides also presented Khweis with a Privacy Act waiver, which authorized the State Department to communicate with Khweis's identified designees. Khweis signed the waiver, identifying only his parents.

The same day, Connelly visited Khweis. Connelly testified that the presiding Kurdish general initially denied the FBI's request to access Khweis but ultimately permitted Connelly to interview him for one hour and to copy his electronic devices. The interview occurred in an office in the CTD detention facility and was attended by two State Department officials and a Kurdish CTD official. Khweis was not handcuffed during the interview. Connelly testified that he decided to interview Khweis for intelligence purposes without providing *Miranda* warnings because his access to Khweis was controlled by Kurdish authorities and might be limited. Connelly believed the risk to any future United States criminal prosecution was worth the valuable intelligence that Khweis could potentially provide about ISIL facilitation networks, organizational structure, and fighters.

4

After this initial interview, Connelly requested permission from the Kurdish authorities to continue interviewing Khweis, which they granted. Connelly interviewed Khweis a second time on March 15 and then on March 17, 18, 19, 20, 23, 26, and 31 and April 7 and 10. Connelly testified that the breaks in the interview schedule occurred when Kurdish officials periodically prevented him from accessing Khweis. Each of the eleven interviews lasted no longer than half a day. The interviews were conducted at the CTD detention center and were attended by a Kurdish CTD official, a State Department official, and occasionally Department of Defense officials. Khweis was not shackled and was provided snacks, cigarettes, and breaks. The Government did not advise Khweis of his *Miranda* rights before any of the interviews.

During the interviews, Khweis described his efforts to join ISIL, identified other ISIL members, and explained his understanding of ISIL operations in the region. Khweis frequently admitted that he had not been fully truthful during prior sessions, resulting in multiple resets of the interview process. In these instances, Connelly would "go all the way back to the beginning and start walking through . . . every single detail of the facilitation network all over again" in order to obtain accurate intelligence. J.A. 487, 492, 2262. Khweis repeatedly expressed a desire to return to the United States for prosecution rather than remain in the Kurdish or Iraqi justice system, and he asked Connelly whether he would be charged and extradited. Connelly advised Khweis that he could not make any promises because the Department of Justice and United States courts made those decisions. Connelly also advised Khweis that his story had to be consistently truthful in order for investigators to determine whether a crime had been committed.

5

While the interviews were ongoing, Connelly discussed Khweis's cooperation with other intelligence agents. On March 22, Connelly described the interviews as "a textbook case of getting a guy from a complete lie to a confession . . . he will not let me down[.]" J.A. 892. Connelly testified that a confession during an intelligence interview is "a good step" because it signals "more full disclosure," but it was not "the goal," as evidenced by the fact that Connelly continued to interview Khweis after this date. J.A. 518. In an email on March 26, Connelly wrote that "[t]his was time very well spent because the extensive time we took getting him comfortable with telling the truth will make it far easier for subsequent interviews here and in the US." J.A. 913. On April 7, Connelly reported that "[Khweis] would not stop talking in an attempt to fill in gaps he previously created. He is going to be very easy to deal with from a clean team perspective." J.A. 885. Finally, on April 8, Connelly commented to other intelligence agents via email that "[Khweis] is lined up perfectly for the clean team." J.A. 894. Connelly's interviews ended on April 10, and neither he nor any other government officials involved in those interviews contacted Khweis after that date.

Ten days later, on April 20, a second team of interviewers met with Khweis for the purpose of a potential United States prosecution. This team consisted of FBI Special Agents Victoria Martinez and Brian Czekela, along with a Kurdish official who had not attended the previous interviews. Martinez and Czekela were walled off from the intelligence team: they did not read Connelly's interview memoranda, did not receive his electronic communications about the interviews, did not speak to him about the substance of Khweis's previous interviews, and did not ask Khweis about what he told Connelly.

6

They were informed only that Khweis had previously been interviewed for intelligence purposes. This interview was conducted in a different conference room in the CTD detention center and did not involve any of the same American or Kurdish officials. The agents advised Khweis of his *Miranda* rights orally and in writing before the interview. The advice-of-rights form, which the agents reviewed with Khweis, also stated in part:

> You have the right to remain silent. We understand that you may have already spoken to others. We do not know what, if anything, they said to you, or you said to them. Likewise, we are not interested in any of the statements you may have made to them previously. We are starting anew. You do not need to speak with us today just because you have spoken with others in the past.

J.A. 886. In addition to apprising Khweis of his right to counsel, the agents advised him that his family had in fact retained counsel for him in the United States.[2] Khweis waived his *Miranda* rights orally and in writing before the interview; he also consented to searches of his electronic equipment.

Martinez and Czekela interviewed Khweis again on April 21 and 23. Before each interview, they advised Khweis of his *Miranda* rights, reminded him that his family had retained counsel on his behalf, and reiterated that he was under no obligation to speak to

---

[2] Khweis's parents retained counsel for him on April 7, 2016. Because this attorney was not listed on Khweis's Privacy Act waiver, the State Department initially was unable to provide the attorney with information about Khweis. Khweis ultimately added the attorney to his Privacy Act waiver on April 23, 2016.

them simply because he had made statements in the past. Khweis again waived his rights orally and in writing before each interview.

The Government filed a sealed complaint against Khweis on May 11, 2016, and he was transferred from Kurdish to United States custody on June 8. During his flight to the United States, Khweis initiated conversation with Martinez and another FBI agent on board. The agents apprised Khweis of his *Miranda* rights, which he waived. During the conversation, Khweis made a number of inculpatory statements. At some point, Khweis invoked his right to remain silent and the agents ceased questioning. Later during the flight, Khweis reinitiated conversation with the agents.

## B.

The district court denied Khweis's motion to suppress the statements he made to Martinez and Czekela.[3] The court reasoned that, although Khweis was subject to two phases of interviews—one before and one after he was informed of his *Miranda* rights— the evidence established that "the FBI did not engage in an intentional scheme to undermine the effectiveness of subsequent *Miranda* warnings." J.A. 2285. In particular, the district court found that the decision not to inform Khweis of his rights before the first interview "was driven by intelligence-gathering needs," "Connelly had good reason to continue interviewing [Khweis] even after obtaining substantial intelligence," and "Connelly's later braggadocio about the success of the interviews did not overturn the

---

[3] The district court also rejected Khweis's presentment challenge, denied his motion to suppress the statements he made to the FBI agents on the June 8 flight to the United States, and held that his confessions were voluntary and not the product of government coercion. Khweis does not contest these rulings on appeal.

8

original justification or affect the later *Mirandized* interviews." J.A. 2285. The court further noted that the "absence of any shared personnel, information, or impressions of the interviewee between the first and second interview teams substantially undermines the claim of a coordinated effort to circumvent *Miranda*." J.A. 2286. Because the court found that the agents did not deliberately undermine *Miranda*, it concluded that "the 'subsequent administration of *Miranda* warnings . . . suffice[d] to remove the conditions that precluded admission of the earlier statement.'" J.A. 2287 (quoting *Oregon v. Elstad*, 470 U.S. 298, 314 (1985)).

Khweis went to trial in May 2017. The jury convicted him on all three counts: conspiring to provide material support or resources to ISIL in violation of 18 U.S.C. § 2339B (Count One), providing material support or resources to ISIL in violation of 18 U.S.C. § 2339B (Count Two), and possessing, using, and carrying firearms during and in relation to a crime of violence in violation of 18 U.S.C. § 924(c)(1)(A) (Count Three). The district court imposed concurrent sentences of 180 months' imprisonment on Counts One and Two and a consecutive sentence of 60 months' imprisonment on Count Three, to be followed by ten years of supervised release.

## II.

When reviewing the denial of a motion to suppress, we "review the factual findings . . . for clear error and the district court's legal determinations de novo." *Abdallah*, 911 F.3d at 209 (quoting *United States v. Hashime*, 734 F.3d 278, 282 (4th Cir. 2013)).

The Self–Incrimination Clause of the Fifth Amendment guarantees that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself." U.S. Const.

9

amend. V. "Recognizing that the pressure and isolation inherent in custodial interrogation could overcome the resilience of a suspect otherwise not inclined to incriminate himself," *United States v. Mashburn*, 406 F.3d 303, 306 (4th Cir. 2005), the Supreme Court in *Miranda* instituted "measures to insure that the right against compulsory self-incrimination is protected," *New York v. Quarles*, 467 U.S. 649, 654 (1984) (brackets omitted) (quoting *Michigan v. Tucker*, 417 U.S. 433, 444 (1974)); *see Miranda*, 384 U.S. at 478–479. Pursuant to *Miranda*, prior to custodial questioning, a suspect must be warned "that he has the right to remain silent, that anything he says can be used against him in a court of law, that he has the right to the presence of an attorney, and that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Miranda*, 384 U.S. at 479. The Supreme Court has "conditioned the admissibility at trial of any custodial confession on warning a suspect of his rights: failure to give the prescribed warnings and obtain a waiver of rights before custodial questioning generally requires exclusion of any statements obtained." *Missouri v. Seibert*, 542 U.S. 600, 608 (2004) (plurality opinion).

But what of *Miranda* warnings administered after questioning has begun? Midstream warnings obviously cannot render prewarning statements admissible, but can they dispel the presumption of involuntariness for postwarning statements? The Supreme Court in *Oregon v. Elstad* concluded that they could. *See* 470 U.S. 298 (1985). As the Court explained, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that a suspect has made an unwarned admission does not warrant a presumption of compulsion." *Id.* at 314. Rather, "[a] subsequent administration of *Miranda* warnings to a suspect who has given a voluntary but unwarned statement

10

ordinarily should suffice to remove the conditions that precluded admission of the earlier statement." *Id.*

In *Elstad*, officers went to Michael Elstad's home with a warrant to arrest him for burglary. *Id.* at 300. While there, an officer questioned Elstad about the burglary without first administering *Miranda* warnings, and Elstad admitted that he was present when the burglary occurred. *Id.* at 300–301. The officers then transported Elstad to police headquarters. *Id.* at 301. About an hour later, the same officers joined Elstad, advised him of his *Miranda* rights, and questioned him about the burglary. *Id.* After waiving his rights, Elstad made additional inculpatory statements. *Id.* The Supreme Court held the postwarning confession admissible, reasoning that "[t]hough *Miranda* requires that the unwarned admission must be suppressed, the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." *Id.* at 309. The Court rejected the notion that a "subtle form of lingering compulsion" tainted the postwarning statement due to "the psychological impact of the suspect's conviction that he has let the cat out of the bag and, in so doing, has sealed his own fate." *Id.* at 311. As the Court explained, even in cases where a prior statement was actually coerced, the Court has assumed that the coercive effect could dissipate with the passage of time, a change in place, or a change in identify of the interrogators. *Id.* at 310; *see also id.* at 311–312. Because Elstad's initial statement was voluntary and the subsequent reading of Elstad's rights was "undeniably complete," the Court held that Elstad's waiver was knowing and voluntary and his subsequent confession was therefore admissible. *Id.* at 314–315.

11

The Supreme Court returned to the question of midstream warnings in *Missouri v. Seibert* to address the admissibility of statements obtained through a two-step police protocol: "first, intentionally withholding *Miranda* warnings from a suspect, questioning the suspect until securing a confession; then obtaining a waiver of *Miranda* rights from the suspect and covering the same material using leading questions." *Mashburn*, 406 F.3d at 307. There, police awakened Patrice Seibert in the middle of the night and took her to the police station, where they deliberately chose not to administer *Miranda* warnings. *Seibert*, 542 U.S. at 604 (plurality opinion). An officer questioned Seibert for 30 to 40 minutes until she admitted her culpability in the alleged murder. *Id.* at 604–605. She was then allowed a 20-minute break, after which the same officer "turned on a tape recorder, gave Seibert the *Miranda* warnings, and obtained a signed waiver of rights from her." *Id.* at 605. The officer then resumed questioning Seibert about the murder, "confront[ing] her with her prewarning statements" and securing her repeated admissions to those statements, cross-examination style. *Id.*

The Supreme Court held that Seibert's postwarning statements should have been suppressed. The plurality reasoned that, in these circumstances, "the warnings could [not] function 'effectively' as *Miranda* requires." *Id.* at 611–612. The plurality distinguished the circumstances of *Elstad* and identified "a series of relevant facts that bear on whether *Miranda* warnings delivered midstream could be effective enough to accomplish their object: the completeness and detail of the questions and answers in the first round of interrogation, the overlapping content of the two statements, the timing and setting of the

12

first and the second, the continuity of police personnel, and the degree to which the interrogator's questions treated the second round as continuous with the first." *Id.* at 615.

Justice Kennedy concurred in the judgment on narrower grounds, providing the fifth vote for suppression. We have previously determined that his opinion "therefore represents the holding of the *Seibert* Court." *Mashburn*, 406 F.3d at 309. In his controlling opinion, Justice Kennedy rejected the plurality's use of a multifactor analysis to determine, for every two-stage interrogation, whether the *Miranda* warnings could have been effective. *Seibert*, 542 U.S. at 621–622 (Kennedy, J., concurring in the judgment). Instead, Justice Kennedy applied "a narrower test applicable only in the infrequent case . . . in which the two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622. In the typical midstream warning case, he explained, the admissibility of postwarning statements "should continue to be governed by the [voluntariness] principles of *Elstad*." *Id.* But if a "deliberate two-step strategy has been used, postwarning statements that are related to the substance of prewarning statements must be excluded unless curative measures are taken before the postwarning statement is made." *Id.* Thus, even when a deliberate two-step strategy has been used, curative measures can render postwarning statements admissible if those measures are "designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* Justice Kennedy reasoned that "a substantial break in time and circumstances between the prewarning statement and the *Miranda* warning may suffice in most circumstances," because it allows the suspect "to distinguish the two contexts and appreciate that the interrogation has taken a new turn." *Id.* (citing *Westover*

13

*v. United States*, decided with *Miranda*, 384 U.S. at 494–497). Because no curative steps were taken in Seibert's case, Justice Kennedy concluded that her postwarning statements were inadmissible. *Id.*

The district court here determined that the Government did not employ a deliberate two-step strategy designed to undermine *Miranda*, J.A. 2287–2288, a conclusion Khweis disputes on appeal. We need not address this question, however, because, even assuming the FBI used a deliberate two-step strategy, we conclude that they instituted sufficient curative measures "designed to ensure that a reasonable person in [Khweis's] situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

The *Mirandized* interviews here began ten days after the unwarned interviews had ended—a period longer than any break during the series of unwarned interviews. Although conducted at the CTD detention center, the warned interviews were held in a different room than the unwarned interviews. Entirely different American and Kurdish personnel attended the *Mirandized* interviews. Agents Martinez and Czekela, who conducted those interviews, did not receive any information about Connelly's intelligence interviews, nor did they ask Khweis about what he told Connelly. The agents therefore could not treat the second set of interviews as continuous with the first, ask leading questions, or cross-examine Khweis with his previous statements. *Cf. Seibert*, 542 U.S. at 616 (plurality opinion) ("The impression that the further questioning was a mere continuation of the earlier questions and responses was fostered by references back to the confession already given."); *id.* at 621 (Kennedy, J., concurring in the judgment) (noting that the postwarning

14

interview "resembled a cross-examination" and that reference to the prewarning statement gave the false impression "that the mere repetition of the earlier statement was not independently incriminating").

Importantly, the agents told Khweis they did not know what, if anything, he had said in prior interviews, a disclosure that would indicate a reset to a reasonable person in Khweis's position. In addition to informing Khweis of his right to remain silent, they also advised him that he did "not need to speak with [them] today just because [he] h[ad] spoken with others in the past." J.A. 886. The advice-of-rights form elaborated that the agents were "not interested in any of the statements [he] may have made to [others] previously." J.A. 886. It explicitly stated: "We are starting anew." J.A. 886. And in addition to apprising Khweis of his right to counsel, the agents informed him that his family had retained counsel for him in the United States.

These circumstances were sufficient to allow a reasonable person in Khweis's position to distinguish between the unwarned interviews with Connelly and the later warned interviews with Martinez and Czekela and to "appreciate that the interrogation ha[d] taken a new turn." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). The break in time and place, total separation of personnel, and thorough explanation to Khweis about the distinction between the *Mirandized* interviews and anything that had come before sufficed to communicate to him "the import and effect of the *Miranda* warning and of the *Miranda* waiver." *Id.* We find this especially true in light of the additional information the agents disclosed. For example, "the import and effect" of the right to silence was preserved and communicated to Khweis by disclosing that the

15

second set of agents did not know what, if anything, he had said to others in earlier interviews—with these agents, he was starting anew, from a baseline of silence.  Similarly, "the import and effect" of the right to counsel was preserved and communicated to Khweis by disclosing that not only did he have a right to counsel in these interviews but his family had already retained counsel on his behalf.

Contrast these circumstances with the "continuum" of questioning in *Seibert*.  *Id.* at 617 (plurality opinion).  There, the first and second interrogations were conducted by the same police officer in the same room, using statements from the first to obtain confessions in the second, separated by a pause of only 15 to 20 minutes.  "These circumstances [so challenged] the comprehensibility and efficacy of the *Miranda* warnings . . . that a reasonable person in the suspect's shoes would not have understood them to convey a message that she retained a choice about continuing to talk."  *Id.*  The same cannot be said here because of the curative measures the FBI employed to distinguish the two sets of interviews and preserve for Khweis a real choice about whether to waive his rights and talk to the second set of agents.

The Supreme Court has found midstream *Miranda* warnings effective in circumstances involving far lesser curative measures than were used here.  In *Bobby v. Dixon*, 565 U.S. 23 (2011) (per curiam), the Court concluded that the defendant's prior unwarned interrogation "did not undermine the effectiveness of the *Miranda* warnings he received" when four hours passed between the two interrogations, during which time the defendant traveled to a separate jail and back, claimed to have spoken with his lawyer, and learned that police were talking to his accomplice and had found the victim's body.  *Id.* at

16

31–32. In the Court's view, these circumstances "created a new and distinct experience" distinguishing the second interrogation from the first. *Id.* at 32 (internal quotation marks omitted); *cf. United States v. Straker*, 800 F.3d 570, 618 (D.C. Cir. 2015) (finding *Miranda* warnings effective when FBI interrogated the suspect with warnings one day after Trinidadian police interrogated the suspect about the same topic without warnings, given the discontinuity of personnel and the fact that the FBI agents "did not refer back to the prior Trinidadian interrogations in an effort to elicit the same confessions"); *United States v. Sweets*, 526 F.3d 122, 130–131 (4th Cir. 2007) (affirming admission of *Mirandized* statements when some time passed between unwarned and warned questioning, a separate officer conducted the warned questioning in a different location, and the questions focused on different topics).

In addition to disputing that the curative measures previously discussed were adequate, Khweis also contends that he "was not told that a period of attenuation was going on," Br. of Appellant 46, nor was he advised that his unwarned statements would not be admissible in court. The FBI was not required to inform Khweis about its plans during the ten-day break between interviews, and Khweis identifies no authority suggesting otherwise. We cannot see how this information would have further distinguished the two sets of interviews after the second team of agents arrived and informed Khweis they were starting anew without any insight into what he may have said in prior interviews.

Furthermore, we disagree with the assertion that the FBI was required to inform Khweis about the inadmissibility of his prior unwarned statements. Although Justice Kennedy mentioned a warning along these lines as a potential "[a]lternative[]" curative

17

measure to "a substantial break in time and circumstances," nothing in his opinion suggests such a warning is essential to cure the effect of prior unwarned questioning. *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). Moreover, a majority of the Court in *Elstad* rejected this argument as "neither practicable nor constitutionally necessary." *See* 470 U.S. at 316. The Court cautioned that "[p]olice officers are ill-equipped to pinch-hit for counsel, construing the murky and difficult questions of when 'custody' begins or whether a given unwarned statement will ultimately be held admissible." *Id.* Indeed, statements obtained in violation of *Miranda* are admissible in certain circumstances. *See*, *e.g.*, *Quarles*, 467 U.S. at 655–657 (establishing a public-safety exception to *Miranda*); *Harris v. New York*, 401 U.S. 222, 226 (1971) (holding that voluntary statements obtained in violation of *Miranda* are admissible for impeachment on cross-examination); *United States v. Nichols*, 438 F.3d 437, 443 (4th Cir. 2006) (holding that voluntary statements obtained in violation of *Miranda* may generally be considered at sentencing). It would have been imprecise, or even misleading, for the agents to assure Khweis that his statements to Connelly could never be used against him.

Finally, Khweis emphasizes that "the only thing he cared about" was avoiding the Kurdish and Iraqi court systems in favor of returning to the United States, which he had come to understand was contingent upon providing the FBI agents with admissions to criminal activity. Br. of Appellant 44, 47. As an initial matter, we note that Khweis has not appealed the district court's ruling that his postwarning statements were voluntary. Nor was there anything improper about Connelly's truthful statement that he could not promise extradition or his encouragement to Khweis to be truthful. *See United States v. Shears*,

18

762 F.2d 397, 401 (4th Cir. 1985) ("[G]overnment agents may validly make some representations to a defendant or may discuss cooperation without rendering the resulting confession involuntary."). In any event, the context of Khweis's capture in the Middle East, a circumstance of Khweis's own making when he chose to travel to Syria and Iraq to join ISIL, does not undermine the effectiveness of the *Miranda* warnings he received or his waiver of those rights.

III.

Khweis separately challenges his conviction for violating Section 924(c). We agree with Khweis and the Government that this conviction cannot stand.[4]

Section 924(c)(1)(A) criminalizes possessing, using, or carrying a firearm during and in relation to a crime of violence. The crime of violence upon which Khweis's Section 924(c) conviction was predicated was conspiracy to provide material support to ISIL in violation of Section 2339B. In *United States v. Davis*, 139 S. Ct. 2319 (2019), the Supreme Court struck down the definition of "crime of violence" in Section 924(c)(3)(B)—often called the "residual clause"—as unconstitutionally vague. Thus, Khweis's predicate crime now must qualify as a crime of violence under the definition in Section 924(c)(3)(A), often referred to as the "force clause." In other words, the predicate crime must have "as an element the use, attempted use, or threatened use of physical force against the person or property of another." 18 U.S.C. § 924(c)(3)(A). Because conspiracy to provide material

---

[4] After Khweis filed this appeal, the Government moved for a limited remand on the ground that his Section 924(c) conviction must be vacated in light of *Davis*. In view of our ruling today, we deny that motion as moot.

support to ISIL does not have as an element the use, attempted use, or threatened use of physical force, it does not qualify as a crime of violence. *See United States v. Dhirane*, 896 F.3d 295, 303 (4th Cir. 2018) (listing the elements of a Section 2339B offense); *cf. United States v. Simms*, 914 F.3d 229, 233–234 (4th Cir. 2019) (en banc) (holding that conspiracy to commit Hobbs Act robbery is not a crime of violence under Section 924(c)(3)(A)). We therefore vacate Khweis's conviction on Count Three.

Because we must remand for resentencing, we do not address Khweis's sentencing arguments, including his contentions that the district court failed to make adequate factual findings before imposing a 12-level enhancement under U.S.S.G. § 3A1.4 and a 2-level enhancement under U.S.S.G. § 2M5.3. *See United States v. Chandia*, 514 F.3d 365, 376 (4th Cir. 2008); *United States v. Hassan*, 742 F.3d 104, 148–149 (4th Cir. 2014). The district court is free to consider Khweis's arguments on remand.

## IV.

For the reasons stated, we affirm the district court's admission of Khweis's statements at trial, vacate Khweis's conviction on Count Three for violating 18 U.S.C. § 924(c)(1)(A), and remand for resentencing.

*AFFIRMED IN PART, VACATED IN PART, AND REMANDED*

FLOYD, Circuit Judge, concurring in part and dissenting in part:

I agree with my colleagues in the majority that Khweis's conviction for using and carrying a firearm during and in relation to a crime of violence under 18 U.S.C. § 924(c)(1)(A) must be vacated. But I would not affirm the district court's ruling on Khweis's motion to suppress the Mirandized statements he made to the second group of FBI agents. Those statements should have been excluded at trial under *Missouri v. Seibert*, 542 U.S. 600 (2004). Therefore, I respectfully dissent.

By and large, I do not take issue with the majority's summary of the relevant factual and procedural history. *See* Maj. Op. 3–9. Nor do I contest its description of *Miranda*, *Elstad*, and *Seibert*—the trilogy of Supreme Court cases that governs our suppression inquiry in a two-step interrogation case such as this one. *See* Maj. Op. 9–14 (discussing *Miranda v. Arizona*, 384 U.S. 436 (1966), *Oregon v. Elstad*, 470 U.S. 298 (1985), and *Seibert*, 542 U.S. 600). But I disagree with the majority's conclusion that, "even assuming the FBI used a deliberate two-step strategy," it instituted "sufficient curative measures" that rendered Khweis's postwarning statements admissible. Maj. Op. 14. In my view, the measures employed by the FBI here were *not* "designed to ensure that a reasonable person in [Khweis's] situation would understand the import and effect" of a midstream *Miranda* warning and waiver, Maj. Op. 14 (alteration in original) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment)), and, therefore, were not sufficiently curative. Because I also conclude that the two-step strategy was deliberately employed, I would hold

21

that the district court erred in denying Khweis's motion to suppress and admitting the postwarning statements at trial.[1]

## I.

At the heart of this appeal is Khweis's motion to suppress the inculpatory statements that he made to FBI Special Agents Victoria Martinez and Brian Czekala while detained by Kurdish officials at a Kurdish Counter-Terrorism Directorate (CTD) detention center in Erbil, Iraq. Khweis made these statements during the second stage of a two-step interrogation process. In a two-step interrogation, officers "question first and warn later." *Seibert*, 542 U.S. at 611 (plurality opinion). That is, authorities interrogate custodial suspects until they secure a confession, and only then do they Mirandize them. *See id.* at 604. Then, after obtaining a *Miranda* waiver, officers proceed to cover the same ground in a second line of questioning. *See id.*

Justice Kennedy's controlling concurrence in *Seibert* governs two-step interrogations. *See* Maj. Op. 12–14; *United States v. Mashburn*, 406 F.3d 303, 309 (4th

---

[1] Although the government asserts that it was harmless error to admit these statements, I am satisfied, based on my review of the trial record, that the error was not harmless. Taken together, Khweis's inculpatory postwarning statements resemble a full-blown confession, the erroneous admission of which is rarely harmless. *See Arizona v. Fulminante*, 499 U.S. 279, 296 (1991). And while the government points to several pieces of evidence that the jury may well have relied upon to convict Khweis of providing, attempting to provide, or conspiring to provide material support or resources to ISIL, in violation of 18 U.S.C. § 2339B, there is at least a "reasonable possibility" that the inadmissible statements "might have contributed to [Khweis's] conviction," *United States v. Giddins*, 858 F.3d 870, 885 (4th Cir. 2017) (quoting *Thompson v. Leeke*, 756 F.2d 314, 316 (4th Cir. 1985)). Thus, I would grant Khweis's request for a retrial on the remaining counts that are not subject to our vacatur ruling.

Cir. 2005).  Under Justice Kennedy's test, "postwarning statements that are related to the substance of prewarning statements must be excluded" if (1) the two-step interrogation strategy was "deliberate[ly] . . . employed," and (2) "curative measures" are not taken before the postwarning statements are made.  *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

The majority's decision today rests on the presence of sufficiently curative measures—the second prong of Justice Kennedy's test.  So, I begin there, taking the two prongs of Justice Kennedy's test in reverse order.

A.

As my colleagues in the majority correctly explain, in *Seibert*, Justice Kennedy stated that any "curative measures should be designed to ensure that a reasonable person in the suspect's situation would understand the import and effect of the *Miranda* warning and of the *Miranda* waiver."  *Id.*  Though Justice Kennedy did not specify precisely what measures would satisfy this test, and thus what measures would dispel the coercion associated with a two-step interrogation, he did offer two examples.  First, "a substantial break in time and circumstances between the prewarning statement and *Miranda* warning" will typically suffice, because it "allows the accused to distinguish the two contexts and appreciate that the interrogation has taken a new turn."  *Id.*  Second, "an additional warning that explains the likely inadmissibility of the prewarning custodial statement" may suffice too.  *Id.*

23

The majority and I thus agree on the applicable legal test for curative measures. Where we part ways, however, is in its application to the facts of this case.

Like the government, the majority seems to believe that this case falls squarely within Justice Kennedy's first example—a substantial break in time and circumstances. *See* Maj. Op. 14–17. The majority holds that the "break in time and place," the "total separation of personnel," and the "thorough explanation to Khweis about the distinction between the *Mirandized* interviews and anything that had come before" sufficed to communicate "'the import and effect of the *Miranda* warning and of the *Miranda* waiver.'" Maj. Op. 15 (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment)). However, I am unpersuaded that these circumstances were sufficient "to allow a reasonable person in Khweis's position to distinguish between the unwarned interviews with [the FBI Assistant Legal Attaché for Iraq, Michael Connelly,] and the later warned interviews with Martinez and Czekala," Maj. Op. 15, and "to 'appreciate that the interrogation ha[d] taken a new turn,'" Maj. Op. 15 (alteration in original) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment)).

Take, first, the "break in time and place." The majority makes much of both the fact that the Mirandized interviews "began ten days after the unwarned interviews had ended—a period longer than any break during the series of unwarned interviews"—and the fact that the unwarned and warned interviews were conducted in different rooms in the same CTD detention center where Khweis was held. Maj. Op. 14. According to the majority, these facts distinguish this case from the interrogations in *Seibert*, which were separated by a mere fifteen- to twenty-minute pause and were conducted in the same room.

24

But this comparison overlooks some important contextual details about Khweis's interrogation.

Admittedly, a ten-day attenuation period is far longer than the twenty-minute attenuation period that fell short in *Seibert*, and even the four-day attenuation period that contributed to a finding of sufficiently curative measures in *Bobby v. Dixon*, 565 U.S. 23 (2011) (per curiam). But Khweis's international detention and interrogation hardly looked like the average two-step interrogation at your local police station. In fact, it was hardly *two* steps at all: At "step one," Khweis was interviewed *eleven times* over the span of nearly a month, on ten separate days. And as time dragged on, so did the length of the breaks between each of the unwarned interviews with Connelly. Near the end of those interviews, there was even a six-day break, which is not much shorter than the ten-day attenuation period. It is hard to say what the difference between a six-day break and a ten-day break should be to the reasonable person in international detention, if any. Regardless, comparing a twenty-minute or four-day break between an unwarned and warned interrogation, on the one hand, and a ten-day break after a lengthy series of unwarned interrogations punctuated by breaks, on the other, is like comparing apples to oranges.

Similar to the pattern of breaks during Khweis's many unwarned interviews with Connelly, the fact that Khweis was detained by a foreign government abroad also diminished the meaningfulness of a ten-day attenuation period. Again, we might well wonder what the difference between a six-day break and a ten-day break feels like to a person in international detention. Even if Khweis was as steadfast in his notches as Robinson Crusoe, it would not have been unreasonable for a person in his shoes to brush

25

off a ten-day break in the interviews based on a number of other factors, such as delays or barriers to access imposed by foreign officials or travel, particularly when a pattern of breaks had already been established. Indeed, in this case, Connelly himself gave Khweis reason to believe that the interviews may not be finished. *See* J.A. 894 (Connelly email dated April 8, 2016, two days before his final interview with Khweis, stating: "I just told him I may have to go back to the states for a few weeks, so don't panic if you don't see me every day but I'll be back."); *see also* J.A. 561 (Connelly testimony that he gave Khweis no indication at the final April 10 interview as to whether the U.S. was done with him or whether the interviews would continue). Therefore, it seems unlikely that a reasonable person in Khweis's situation would have experienced the ten-day attenuation period as a unique break in time. To hold otherwise would make golden the calendar but tarnish the test. *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment) (framing the curative-measures analysis from the perspective of "a reasonable person *in the suspect's situation*" (emphasis added)).

Moreover, merely switching rooms within the detention facility was insufficient to create a break in place, thereby contributing to a "significant break . . . in circumstances." *See id.* (distinguishing the facts of *Westover v. United States*—one of the cases consolidated with and decided alongside *Miranda*—in referencing a "substantial break in time and circumstances"); *Miranda*, 384 U.S. at 496 (stating, as part of *Westover* holding, that "[a] different case would be presented if an accused were . . . removed both in time *and place* from his original surroundings" (emphasis added)). The Supreme Court has treated an interview conducted "in the same police station" as being in the same place. *See Miranda*,

26

384 U.S. at 496 (explaining, again in the *Westover* case, that because the FBI's warned interrogation followed on the heels of an unwarned interrogation by local police and was held "in the same police station," the suspect was not removed "in time and place from his original surroundings"). Why shouldn't the same principle apply here, given that both phases of the interrogation occurred in the same detention facility?

The majority's emphasis on different rooms perhaps arises from a question that is difficult to answer from the record: did the government have a different facility to which it could have taken Khweis? Yet even if the answer is no, that cannot render Khweis's Mirandized interviews less coercive. Put another way, when the government deliberately chooses to employ a two-step interrogation process, it must craft a measure that actually cures the coercion. It is not enough that the government does the best it can under the circumstances.[2]

Next up is the "total separation of personnel," which the majority also leans on to conclude that a reasonable person would have appreciated the difference between the two

---

[2] None of this is to suggest that the U.S. government was not in a difficult situation here. Connelly's testimony at the suppression hearing makes clear that there were many things outside of the FBI's control. But determining whether a measure is sufficiently curative requires us to view the situation from the perspective of the reasonable suspect. For that reason, the government's efforts to make the best of a difficult situation, however admirable, are irrelevant to our inquiry unless they help the suspect appreciate that things have changed. Though this may seem harsh, the government is not left without options: Even assuming, purely for the sake of argument, that there were *no* actions that the government could have taken to create a substantial break in time and circumstances here, it still could have crafted an appropriate "additional warning," *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment), as I discuss below. In other words, the government's hands are never really tied if it is willing to at least provide a comprehensive warning before obtaining a *Miranda* waiver at step two of the interrogation.

27

phases of the interrogation. Although a difference in personnel—and particularly a difference in the identity of the interrogator—is certainly relevant to our analysis, it is not very probative here. From Khweis's point of view, the phase two interrogators—Martinez and Czekala—were still FBI agents, just like Connelly. *Cf. United States v. Straker*, 800 F.3d 570, 618 (D.C. Cir. 2015) ("Not only were the FBI agents who interrogated [the defendants] different from the Trinidadian police officers who initially questioned them, but the FBI agents represented an entirely different law enforcement authority from an entirely different country."); *United States v. Abu Khatallah*, 275 F. Supp. 3d 32, 38 (D.D.C. 2017) (case involving step-one questioning by "U.S. intelligence agents," followed by step-two questioning by "FBI agents").

And there is more. Shortly before the unwarned interviews concluded, Connelly told Khweis that he was returning to the U.S. for a few weeks to "check" the information that Khweis had provided, J.A. 561, but that Khweis should not "panic," as Connelly would be "back" eventually, J.A. 894. At the final interview, Connelly did not give Khweis any indication as to whether the U.S. was done with him or whether the interviews would continue; instead, Connelly apparently told Khweis that the U.S. had yet to decide whether to charge him with a crime because the investigation was still pending. *See* J.A. 550–54, 561; *see also United States v. Khweis*, No. 1:16-cr-143, 2017 WL 2385355, at *3 (E.D. Va. June 1, 2017) (noting that while Connelly had advised Khweis that the FBI could not make any promises about a future prosecution in the U.S., Connelly also told him that "the charging process was dependent on the FBI's evaluation of the evidence" and that Khweis's "story had to be consistently truthful in order for investigators to determine if a

28

crime had been committed"). Under these circumstances, it would have hardly been unreasonable for someone in Khweis's position to draw a connection between the two phases of the interrogation process based on the institutional identity of the interrogators.

To be sure, Martinez and Czekala attempted to downplay any relation between the two interrogation phases by stating, among other things, that they did not know what, if anything, Khweis had told others in the past and that they were "starting anew." J.A. 886; *see* Maj. Op. 6–8, 15 (highlighting the "thorough explanation" given by Martinez and Czekala and discussing its contribution to Khweis's ability to "'appreciate that the interrogation ha[d] taken a new turn'" (alteration in original) (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment))). In my view, however, these statements were not enough to prevent "the unwarned and warned interrogations [from] blend[ing] into one 'continuum.'" *Bobby*, 565 U.S. at 31 (quoting *Seibert*, 542 U.S. at 617 (plurality opinion)).

Simply put, advising a person that the circumstances have changed is not the same thing as the circumstances actually changing. Perhaps the former may help create a "new and distinct experience" in some future case. *See id.* at 32 (quoting *Seibert*, 542 U.S. at 615 (plurality opinion)). But it did not do so here. Again, not only was there an institutional overlap in personnel in this case, with both sets of interrogators hailing from the same *law enforcement* agency, but Connelly had told Khweis that he would be out of the country for a while, without giving him any indication that the so-called "intelligence" interviews were finished. What is more, Connelly had told Khweis during the unwarned interviews that he needed to be consistently truthful in order for the FBI to determine

whether a crime had been committed, and thus for the U.S. to determine whether to file charges. *Khweis*, 2017 WL 2385355, at *3. When asked similar questions about his efforts to join ISIL by more FBI agents, it is unsurprising that Khweis told the same story. It also was not the first "reset" in the interview process. *See id.* ("Connelly testified that [Khweis] repeatedly admitted to not being fully truthful at various stages of the interviews, resulting in a 'reset' of the interview process."). This only added to the air of continuity between the two sets of interviews.

Considering the above facts, it is hard to imagine what it would have taken for a reasonable person to realize that "[t]hings had changed." *Bobby*, 565 U.S. at 32.[3] This, in

---

[3] The majority relies on *Bobby* as an example of "far lesser curative measures" creating a new and distinct experience from the suspect's perspective. Maj. Op. 16–17. In *Bobby*, the majority asserts, the Supreme Court concluded that the defendant's prior unwarned interrogation "did not undermine the effectiveness of the *Miranda* warnings he [later] received," 565 U.S. at 32, when "four hours passed between the two interrogations, during which time the defendant traveled to a separate jail and back, claimed to have spoken with his lawyer, and learned that police were talking to his accomplice and had found the victim's body," Maj. Op. 16–17 (citing *Bobby*, 565 U.S. at 31–32). However, for the same reasons that *Seibert* is a poor yardstick for measuring the adequacy of the measures taken in this case given the uniqueness of the situation Khweis found himself in, I find it difficult to characterize the measures taken in *Bobby* as "far less[] curative." In any event, *Bobby* is a poor comparator for a different reason. Before commenting on the "significant break in time and dramatic change in circumstances" in *Bobby*, the Supreme Court distinguished *Seibert* on another ground, stating that "no two-step interrogation technique of the type that concerned the Court in *Seibert* undermined the *Miranda* warnings [that the defendant] received." *Bobby*, 565 U.S. at 31. The Court explained that unlike in *Seibert*—where "the suspect's first, unwarned interrogation left little, if anything, of incriminating potential left unsaid, making it unnatural not to repeat at the second stage what had been said before"—the suspect in *Bobby* had "steadfastly" maintained his innocence in his first, unwarned interrogation, claiming "he had nothing whatsoever to do with [the victim's] disappearance." *Id.* (internal alteration and quotation marks omitted). Thus, "there was no earlier confession to repeat." *Id.* The break in time and circumstances, then, was enough when the cat was *not* out of the bag. That is simply not the case here: Like in *Seibert*, Khweis confessed, and then re-confessed.

turn, made an "additional warning"—the second and alternative type of curative measure identified by Justice Kennedy in *Seibert*—all the more important.

The "additional warning" contemplated by Justice Kennedy is one that "explains the likely inadmissibly of the prewarning custodial statement." *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment). There is no question that such a warning was not given here. *See* J.A. 886 (advice-of-rights form); J.A. 708–10, 729–30, 751–53, 778 (Czekala and Martinez suppression hearing testimony); *see also Khweis*, 2017 WL 2385355, at *4 & n.5.

Nevertheless, both the government and the majority suggest that such a warning is *never* required because *Elstad* "squarely rejected additional filigrees on the *Miranda* warnings that would force officers to make representations about 'whether a given unwarned statement will ultimately be held admissible.'" Resp. Br. 44 (quoting *Elstad*, 470 U.S. at 316); *see* Maj. Op. 18. They are wrong. *Seibert* was decided after *Elstad*, and Justice Kennedy's opinion in *Seibert* controls our analysis in this case. Furthermore, although the majority expresses concern that "[i]t would have been imprecise, or even misleading, for the agents to assure Khweis that his statements to Connelly could *never* be used against him," Maj. Op. 18 (emphasis added), an agent in Martinez or Czekala's position need not make any definitive representation about the inadmissibility of a given statement in order to advise a suspect about a statement's "*likely* inadmissibility," *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment) (emphasis added). *See, e.g.*, *Abu Khatallah*, 275 F. Supp. 3d at 64 n.12 (finding, albeit only in dictum, that sufficiently curative measures were taken when FBI agents "included an extra paragraph to inform [the

31

defendant] that his prior statements would 'probably not be used against [him] in U.S. courts'" (second alteration in original)); *cf. United States v. Hasan*, 747 F. Supp. 2d 642, 667 (E.D. Va. 2010) (discussing a "cleansing statement" read to the defendants by a special agent in the Naval Criminal Investigative Service after an unwarned interview, which stated, in pertinent part, that "[i]t is possible that the statements you previously made may not be admissible against you").

For these reasons, I would hold that the measures taken by the FBI were not sufficiently curative within the meaning of *Seibert*.

B.

Given the absence of sufficiently curative measures, I must turn to the antecedent question of deliberateness. Recall that under the first prong of Justice Kennedy's two-part test, courts ask whether the two-step interrogation strategy was *deliberately* employed; if it was, then postwarning statements "must be excluded unless curative measures are taken" before those statements are made. *See Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment).

The deliberateness requirement arose as a response to the plurality's test, which would have applied to "both intentional and unintentional two-stage interrogations." *See id.* at 621; *see also id.* at 615–17 (plurality opinion) (asking "whether *Miranda* warnings delivered midstream could be effective enough to accomplish their objective" from the perspective of "a reasonable person in the suspect's shoes"). Justice Kennedy opted for a "narrower test," applicable "only in the infrequent case, such as we have here, in which the

two-step interrogation technique was used in a calculated way to undermine the *Miranda* warning." *Id.* at 622 (Kennedy, J., concurring in the judgment). Thus, Justice Kennedy concluded that "unless the *deliberate two-step strategy* was employed," the admissibility of postwarning statements would "continue to be governed by the principles of *Elstad*." *Id.* (emphasis added). In this sense, Justice Kennedy was merely reiterating what the Supreme Court held in *Elstad*, which is that "a simple failure to administer [*Miranda*] warnings" does not "so taint[] the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period.'" *Id.* at 620 (quoting *Elstad*, 470 U.S. at 309); *see also id.* (observing that "*Elstad* was correct in its reasoning and its result" because "[a]n officer may not realize that a suspect is in custody and warnings are required," "may not plan to question the suspect," or "may be waiting for a more appropriate time").

In this case, the government concedes that Khweis was subjected to a two-step interrogation. *See generally Khweis*, 2017 WL 2385355, at *13. But it contends that this strategy was not "used in a calculated way to undermine the *Miranda* warning" and, therefore, was not deliberately employed within the meaning of *Seibert*. Resp. Br. 38 (quoting *Seibert*, 542 U.S. at 622 (Kennedy, J., concurring in the judgment)). As the government tells it, the two phases of Khweis's interrogation merely served as a means to demarcate the FBI's intelligence-gathering efforts from its subsequent, Mirandized criminal-investigation efforts.

The district court agreed. Based on the evidence presented at the suppression hearing, it found no intentional scheme to circumvent *Miranda*. *See Khweis*, 2017 WL

33

2385355, at *13–15. As the majority notes, the district court cited three reasons in support of this finding. First, the district court explained that Connelly's decision not to Mirandize Khweis before the first interview was "driven by intelligence[-]gathering needs." *Id.* at *14. Second, it stated that Connelly had "good reason to continue interviewing [Khweis] even after obtaining substantial intelligence." *Id.* at *14; *see id.* at 15. Third, it reasoned that Connelly's "later braggadocio" about the success of the Mirandized interviews in emails to colleagues who were not members of the clean team did not undermine Connelly's initial justification for the unwarned interviews or affect the Mirandized interviews. *Id.* at *14.

At bottom, the district court's rationale was premised on its view that intelligence-gathering is a legitimate reason to interrogate a terrorism suspect. Because the Supreme Court has never had occasion to apply *Seibert* to a two-step interrogation in the counterterrorism context, it has not wrestled with the potential significance of an intelligence-based motive for the first (unwarned) phase of a two-step interrogation. Doing so presents unique challenges to assessing the deliberateness of a two-step strategy. *See generally* Katherine Kaiser Moy, Note, *Tailoring* Seibert*'s Intent Inquiry to Two-Step Counterterrorism Interrogations*, 71 Stan. L. Rev. 215 (2019).

In a pure criminal-investigation context, the deliberateness inquiry is straightforward: Was the two-step technique purposefully used? *See Seibert*, 542 U.S. at 619–22 (Kennedy, J., concurring in the judgment). Or, put differently, did the agents "intentional[ly]" "fail[]" to convey *Miranda* warnings"? *Mashburn*, 406 F.3d at 309; *see also Wallace v. Branker*, 354 F. App'x 807, 823 (4th Cir. 2009) ("In *Seibert* the Court

34

addressed the consequences of a deliberate rather than inadvertent delay of *Miranda*

warnings."). If the answer is yes, then the deliberateness prong is easily satisfied.[4]

In the counterterrorism context, however, there is at least a conceivable alternative

reason for intentionally refusing to Mirandize a suspect that is untethered to the criminal-

justice process: national security and intelligence gathering. Thus, assuming we defer to

the district court's credibility determination about Connelly's later statements not

reflecting an ulterior motive for the un-Mirandized interviews, the question becomes, did

Connelly's intelligence-gathering motive render the two-step process non-deliberate under

Justice Kennedy's test? Or is the fact that Connelly *chose* not to Mirandize Khweis because

he was concerned that Khweis would invoke his right to remain silent still dispositive,

given the accidental-versus-intentional paradigm suggested by *Seibert*?

Fortunately, we need not confront these difficult questions head-on in order to

resolve this case. That is because Justice Kennedy's controlling opinion in *Seibert* leaves

open the possibility that the *systematic* use of a two-step interrogation strategy might be

deliberate, and here, there is strong evidence of a systematic two-step strategy that was

driven, in part, by a law enforcement purpose. Therefore, by lasering in on Connelly's

---

[4] Of course, a statement obtained in deliberate violation of *Miranda* may be admissible, regardless of curative measures, if an exception to the *Miranda* rule applies, such as the public-safety exception announced in *New York v. Quarles*, 467 U.S. 649 (1984). But the government does not rely on the *Quarles* exception here, *see* Gov't Br. 22 n.2, and rightfully so: By its own terms, *Quarles* only applies to questioning necessary to defuse a "volatile situation." 467 U.S. at 657–58; *see also id.* at 659 n.8 (requiring an "immediate" threat to the police or public).

asserted intent as the step-one interrogator, the district court took too cramped a view of what constitutes a "deliberate" effort to circumvent *Miranda* via a two-step interrogation.

The two-step interrogation protocol that the Supreme Court addressed in *Seibert* was carried out by a single police officer. *See* 542 U.S. at 604–06 (plurality opinion). Thus, Justice Kennedy's deliberateness test is clearly satisfied when, like in *Seibert*, an officer intends to exploit the two-step interrogation process as an end run around *Miranda*. But a two-step interrogation tactic that is deliberately employed at the *policy level* implicates the same concerns that troubled Justice Kennedy in *Seibert*. Even crediting the district court's finding that Connelly was motivated solely by "the unique intelligence opportunities" presented by Khweis's arrest "on suspicion of terrorism, in an active war zone, near ISIS-controlled territory," *Khweis*, 2017 WL 2385355, at *14, such intelligence-gathering interests will often intersect with the FBI's law-enforcement interests. This case is a perfect example: In the unwarned phase of the interviews, Connelly elicited information about Khweis's efforts to join ISIL, other members he encountered in the organization, and ISIL's operations in the region. This may be valuable intelligence for the FBI, but the same information was likely to inculpate Khweis as a suspect and, indeed, was critical to the government's theory in Khweis's case. *See generally* J.A. 1058–75 (government opening argument); J.A. 1487–89, 1492–1531, 1540–42, 1553–55, 1579 (Czekala trial testimony); J.A. 1640–47, 1661–67, 1675–77, 1684–85, 1691–1705, 1726–28, 1732–33 (Martinez trial testimony); J.A. 2178–2204 (government closing argument).

The upshot is that even if an FBI agent, like Connelly, has the purest of intentions in that he does not seek to assist the "investigative" team in obtaining a postwarning

36

confession—and even if investigative agents like Martinez and Czekala are likewise innocent of any ulterior motive to exploit the earlier, unwarned "intelligence" questioning—the fact remains that the investigative team is likely to benefit from whatever the intelligence team unearths. If we were to ignore this reality by homing in on the intentions of the individual officers on the ground who are involved in different stages of the two-step interrogation process, we would discount the significance of a higher-level decision to implement this strategy in the first place. And if we were to discount the significance of a higher-level decision to adhere to a two-step interrogation model, we would risk incentivizing the same end run around *Miranda* that Justice Kennedy sought to prevent by outlawing a "deliberate two-step strategy." *See Seibert*, 542 U.S. at 621–22 (Kennedy, J., concurring in the judgment).

Because the district court found Connelly's motivations to be "highly probative" on the question of subjective intent, *see Khweis*, 2017 WL 2385355, at \*14, it did not address the evidence in the record that demonstrated a systematic use of the two-step strategy. There was quite a lot of it.

For starters, as even the district court acknowledged in its opinion, Connelly testified that he only made the decision to intentionally withhold *Miranda* warnings from Khweis after consulting with his supervisors. *Id.* at \*2; *see also* J.A. 460, 548–49 (testimony from Connelly explaining that when deciding whether "to deliberately withhold *Miranda*," he would call his boss in Baghdad, and they would then call FBI headquarters in Washington and the FBI's Office of General Counsel). This testimony—along with Connelly's testimony about his familiarity with the difference between an "intelligence"

37

(or "taint") team that conducts un-Mirandized interviews, on the one hand, and a "law enforcement" (or "clean") team that conducts Mirandized interviews after an "attenuation period" that "the U.S. Department of Justice . . . likes [the FBI] to utilize" in cases with prosecution potential, on the other—strongly suggests the existence of certain department-wide procedures. *See* J.A. 461–64, 497–503, 522–30, 547–50, 570–72.[5]

Agent Martinez's testimony at the suppression hearing only corroborated the existence of such procedures. Martinez testified that the "modified" advice-of-rights form that she gave Khweis was provided to her by the FBI (and likely DOJ), J.A. 766, and was prepared by attorneys, J.A. 767, 778. Notably, she also testified that there is FBI training on "walled-off interviews and intel interviews." J.A. 776–77.

Finally, although the district court disregarded Connelly's repeated references to a "clean team" in emails sent to his colleagues in the FBI, *see Khweis*, 2017 WL 2385355,

---

[5] *See also* J.A. 522–24 (testifying that the April 7 email about Khweis being "very easy to deal with from a clean team perspective" was sent to Connelly's "management team," which would periodically ask for his assessment regarding where Khweis was "at" in order to determine whether a clean team or attenuation period should be used); J.A. 549–50 (testifying that when he began the unwarned interviews with Khweis, he knew that it was possible that a clean team might come in later to question Khweis); J.A. 564–66 (testifying, in response to a question about the intelligence purpose of his April 8 observation that Khweis was "lined up perfectly for the clean team," that "[i]t's a discussion we have. Like when I discuss whether he's lined up perfectly, there may be, you know, FBI personnel deciding whether they want to deploy a clean team . . . . I mean, the Bureau has to start figuring out what they're going to do next."); J.A. 571–73 (testifying about a March 19 email that he sent to Department of Defense employees in which he stated that there were "certain requirements I'm being held to in reporting to the Department of Justice regarding every interview session now that this case is going to be prosecuted," and clarifying that when the FBI conducts "intel" interviews overseas that have "a potential to be prosecuted," they must stay in the FBI/DOJ lane, rather than the military lane, given the "potential to end up in a courtroom").

at *14 (stressing that these emails were sent to "other members of the FBI intelligence team—not the *Mirandizing* team"), Connelly's mention of Khweis being "lined up perfectly for the clean team," J.A. 894, for example, helps establish that there was, in fact, a two-stage interrogation policy. *See generally* Maj. Op. 6 (summarizing Connelly's "clean team" emails); J.A. 895, 921–22 (further references to the "taint" and "clean" team, as well as an "attenuation period," in Connelly's emails); J.A. 901 (email from a Department of Defense employee during the unwarned interview period describing the "way ahead" as involving "one more . . . session followed by clean team arrival from [Washington Field Office] and prosecution determination from FBI"). Indeed, even the government's opposition to Khweis's motion to suppress below hints at the existence of a policy. *See* J.A. 142 (characterizing the circumstances warranting a two-step interrogation in Khweis's case as "unique," but going on to explain, in more general terms, that the "process was designed to enable the [U.S.] government both to protect its national security interests and to subsequently pursue a criminal investigation of the defendant").

Accordingly, I would hold that the FBI deliberately employed a two-step interrogation process in this case. That is not to say that the FBI was *wrong* to employ this process, but just to say that, having chosen to do so, it needed to cure the inherent coercion. Because I do not believe that the FBI cured the coercion that a reasonable person would feel under the circumstances, *see supra* Part I.A, I would hold that Khweis's Mirandized statements to Agent Martinez and Agent Czekala should have been suppressed.

39

## II.

For the foregoing reasons, it was error for the district court to admit the postwarning statements that Khweis made to Agent Martinez and Agent Czekala during his custodial interviews at a Kurdish CTD detention center in Iraq. Because that error was not harmless, *see supra* note 1, I would vacate Khweis's convictions on all three counts and remand for a retrial on the two counts that survive our ruling on Khweis's firearms conviction, namely, conspiracy and the provision of material support to a foreign terrorist organization.